**UNITED STATES of America,**
**Appellees,**

v.

**Alphonse M. MEROLLA and Thomas McNamara, Appellants.**

**Nos. 935, 959, Dockets 75–1011, 75–1017.**

United States Court of Appeals,
Second Circuit.

Argued May 2, 1975.

Decided Aug. 11, 1975.

explored and definitively made a part of the record by discovery procedures followed by a detailed affidavit.

Phylis Skloot Bamberger, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for appellant Merolla.

S. Hazard Gillespie, New York City (Davis, Polk & Wardwell, New York City, on the brief, Porter R. Chandler, Thomas J. Aquilino, Jr., Lowell Gordon Harriss, Henry H. Korn, New York City, of counsel), for appellant McNamara.

Robert H. Plaxico, Atty., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., E. D. N. Y., David J. Ritchie, Special Atty., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before: MOORE and MANSFIELD, Circuit Judges, and HOLDEN,* District Judge.

MOORE, Circuit Judge:

Appellants Thomas McNamara and Alphonse M. Merolla [1] were convicted, after a jury trial in the United States District Court for the Eastern District of New York, Judge Dooling presiding, of conspiring to delay, obstruct and affect interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951.[2]

In seeking reversal of their convictions, appellants raise the following claims of error: 1) the Hobbs Act applies only to the illegal activities of unions and union officials; 2) the district court erred in not ruling as a matter of law that the evidence of interference with interstate commerce was insufficient to support the jury verdict; 3) the court's instructions on the commerce element erroneously withdrew from the jury's consideration the issue of whether interstate commerce was affected by appellants' conduct; 4) the court's instructions as to assessing the credibility of the government's chief witness were erroneous; 5) the court erred in not ruling as a matter of law that the evidence that appellants specifically conspired to obstruct interstate commerce was insufficient to support a conviction of conspiring to obstruct interstate commerce as proscribed by the Hobbs Act; and 6) the court erred in not instructing the jury that a necessary element of conspiracy to violate the Hobbs Act is a specific intent to obstruct, delay, or affect interstate com-

---

* Honorable James S. Holden, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

1. Appellants were originally tried in January 1974 along with four co-defendants. The jury acquitted two of the co-defendants and a mistrial was declared as to the others. Appellants were retried in October 1974.

2. 18 U.S.C. § 1951(a) provides as follows:

"§ 1951. *Interference with commerce by threats or violence*

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

merce. Because we are persuaded by appellants' second contention—that the government failed to establish that appellants' conduct affected or necessarily would have affected interstate commerce—we do not reach the remaining issues.[3] We reverse.

Appellant McNamara, an automobile dealer, acquired some land in Brookhaven, New York, in the fall of 1971 intending to have a new showroom constructed there. After three months of negotiation, McNamara executed a contract with Harold Goberman to have the latter build the car facility. Goberman formed a corporation, HarMac Construction Company ("HarMac"), assigned his rights under the contract to the new corporation, and engaged various subcontractors (who were concededly doing business in interstate commerce) to provide needed materials and labor.

The initially amicable relationship between the two parties began to deteriorate in May 1972. McNamara was unhappy about the manner in which his structure was being built and doubted that the subcontractors were being paid. Goberman, on the other hand, was annoyed at the extent to which McNamara was involving himself in the construction process and began slowing construction down.[4]

Taking the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), events proceeded as follows: Goberman's construction superintendent was threatened on the job site once in late May by appellant Merolla alone and again a few days later by Merolla in the company of McNamara. The import of the threats was that Merolla also had an interest in the project and knew where the superintendent lived, should the construction not proceed properly.

On June 5, Merolla came to the site to find Goberman and arranged a meeting for later that day. Two meetings took place. At the second, Merolla placed a knife to Goberman's side and threatened to kill him. Still later on June 5 Goberman complied with a telephone request that he go to McNamara's office. He was met there by appellants and five others who demanded he finish the building and asked why he was not paying his bills. After being beaten and threatened with a revolver, Goberman, at the direction of McNamara, wrote a check for $1300 to McNamara and further signed over to McNamara title to a house trailer which Goberman had been using at the construction site.[5]

After June 5, 1972, the antagonism between Goberman and McNamara was unabated. McNamara continued to make advances (although there is some confusion as to the number and amounts of these advances) but also persisted in his belief that Goberman was not paying the subcontractors.

On June 20 the Town of Brookhaven posted the construction site directing that all work cease due to State building code violations.[6] Construction stopped. On June 24, McNamara wrote to Goberman purporting to terminate the contract due, among other things, to breaches in the contract, failure to pay subcontractors and violations of local ordinances. Goberman responded through

3. "[T]here are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. . . . [T]hat interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1959).

4. Other grounds for disaffection include McNamara's discovery of Goberman's criminal record.

5. It is apparently unchallenged by the prosecution that Goberman purchased the trailer with funds advanced by McNamara under the contract. Over the course of four months (from March 4, 1972 to June 16, 1972) McNamara's payments and advances to Goberman amounted to over $200,000.

6. There was evidence adduced at trial indicating that the building had a crack in the front wall, a steel beam protruded from the front wall, cracks in the cinderblocks and terracotta and a drainage problem due to a sagging roof.

his attorney that he would not voluntarily forego his rights under the contract.

On June 28 Goberman was met by Merolla and taken to the apartment of McNamara's son.[7] Goberman testified that he was beaten by Merolla and several other men and that thereupon he signed a contract release and a document acknowledging receipt of $25,000.[8]

Goberman did not further work under the contract nor did he receive the $25,000 which he had been forced to acknowledge. The facility was finished in September 1972 by another builder.

### INTERSTATE COMMERCE ELEMENT

■ With regard to interstate commerce, the evidence at trial showed that (1) pursuant to a contract between Goberman and Merkel Electric Co. for the installation of lighting apparatus, electrical supplies were delivered to the job site from out of state; (2) steel joists and steel roof decking were shipped interstate to the job site in satisfaction of orders which Goberman placed with Fiberproof Products, Inc.; (3) in fulfillment of an agreement between Goberman and Warren Brady for the installation of garage doors, doors were delivered to the job site from their place of manufacture in New Jersey and (4) new automobiles which appellant McNamara sold at the completed showroom were assembled in other states and transported into New York.

The government advances two theories for the proposition that appellants' assaultive and extortionate activities affected interstate commerce thereby drawing the otherwise local offenses within the ambit of the Hobbs Act. First the government contends that appellants' conduct depleted Goberman's assets to the extent of $1300, a house trailer and his rights under the building contract thereby affecting (diminishing) the buying power of a construction business engaged in interstate commerce.

Second, even absent a diminution or delay of interstate commerce it is urged upon us that appellants affected commerce by forcing Goberman to desist from engaging in, or being involved with, interstate commerce and replacing him with another, who ultimately installed the goods shipped in interstate commerce and completed the car facility which would receive cars from out of state.

■ We find neither argument persuasive when applied to the facts of the instant case. As for the depletion of assets theory, we have no difficulty with the general premise. Where the victim of an extortion scheme *customarily* obtains supplies through interstate commerce, the diminution of the victim's resources impairs his purchasing power and may therefore be found to affect interstate commerce for the purpose of the Hobbs Act. *See, e. g., United States v. Crowley,* 504 F.2d 992 (7th Cir. 1974); *United States v. Pacente,* 503 F.2d 543 (7th Cir. 1974), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642; *United States v. Gill,* 490 F.2d 233 (7th Cir. 1973), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974); and *United States v. DeMet,* 486 F.2d. 816 (7th Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). See also *United States v. Addonizio,* 451 F.2d 49, 77 (3rd Cir.), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972) and *United States v. Provenzano,* 334 F.2d 678, 692 (3rd Cir. 1964), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544.

The victim's purchase of interstate goods, however, must be of a continuing nature or the relationship between the extortion and any interstate commerce becomes merely conjectural. The cases relied upon by the government all involve ongoing establishments with recurring shipments from out-of-state. Thus, in *United States v. Augello,* 451 F.2d 1167 (2d Cir. 1971) a restaurant's continuous interstate shipments of meat sup-

---

7. On June 28 McNamara was not present in the apartment.

8. The release had been prepared on June 6 at McNamara's direction by one of his attorneys.

plies might have been curtailed. In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1959) a cement plant purchased sand from out of state over at least a two year period. Whereas in the present case, there is no evidence that Goberman was involved in any on-going business, let alone an ongoing business with recurring interstate purchases. It appears from the record that Goberman, until he entered the car showroom contract, was employed as an estimator by his brother's construction firm, that he formed his own construction company only after executing the building contract with McNamara, and that he either borrowed needed construction equipment from his brother's firm or purchased it with advances from McNamara. There is no indication that Goberman had undertaken any other construction jobs. On the contrary, Har-Mac appeared to be a one-shot deal arising out of Goberman's fast friendship with McNamara. Not only was this Goberman's sole construction venture, but also, as the record indicates, all necessary material for the project had already been delivered to the site by June 5—the date appellants first extorted property from Goberman. Thus there is no reason to believe that Goberman would have purchased goods in interstate commerce for the showroom project or any other construction project had his buying power not been diminished.

The government next argues that appellants' extortion affected interstate commerce by forcing Goberman to give up his rights under the contract resulting in (1) goods previously shipped in interstate commerce being ultimately installed by someone other than Goberman and (2) the car facility which subsequently received cars from out of state being completed by someone other than Goberman.

The government cites as support for this theory *United States v. Addonizio*, 451 F.2d 49, 92 S.Ct. 949, 30 L.Ed.2d 812 (3d Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), where the court found that the exaction of tribute from contractors engaged in *local* construction work who are engaged in constructing *facilities to serve* interstate commerce was subject to prosecution under the Hobbs Act. We believe that *Addonizio* is clearly distinguishable from the facts in the instant case. The interstate commerce element was satisfied in *Addonizio* because the defendants by extortion were affecting the participation in interstate commerce of third persons. Here since there was no showing that Goberman was engaged in an on-going business in interstate commerce, any effect on him does not bring the statute into operation. Any effect on the construction or on the arrival of new cars operated on McNamara the defendant. He was in a position to fully determine whether to engage in interstate commerce by selling cars or not. We do not see how he can be subject to prosecution under this statute for restraining or affecting his own commerce where he has a right to lawfully choose to cease construction or abandon the business of selling automobiles.

The evidence in this case established a simple case of assault and/or extortion under state law. Congress intended that federal courts should exert jurisdiction in these types of cases only where the defendant's actions cause or might cause an interference with interstate commerce.

We believe that the government failed to establish the interference with interstate commerce which is essential in a Hobbs Act prosecution. Therefore, we reverse the convictions of the appellants and remand to the district court with directions to dismiss the indictment.