UNITED STATES of America, Appellee,

v.

Theodore G. DALEY,
Defendant-Appellant.

No. 4, Docket 77–1262.

United States Court of Appeals,
Second Circuit.

Argued Sept. 27, 1977.

Decided Oct. 20, 1977.

Kenneth V. Handal, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Frank H. Wohl, Frederick T. Davis, Asst. U. S. Attys., New York City, of counsel), for appellee.

Gustave H. Newman, New York City (Roger Bennet Adler, New York City, of counsel), for defendant-appellant.

Before MOORE, FEINBERG and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

█ Theodore G. Daley appeals from judgments of conviction entered in the United States District Court for the Southern District of New York after a three-week trial before the Hon. Morris E. Lasker, *District Judge*, and a jury. The indictment which was filed on August 3, 1976 contained one count charging Daley with conspiracy to violate the Hobbs Act [1] and another count charging him with extortion, a substantive violation of the Hobbs Act, 18 U.S.C. § 1951. The indictment also charged Daley, a union official, with five counts of accepting goods and services from employers of union members in violation of the Landrum-Griffin Act, 29 U.S.C. § 186(b)(1), (d). The jury found Daley guilty on all seven counts on March 10, 1977. Judge Lasker suspended the imposition of sentence on all counts and placed Daley on probation subject to special conditions for three years. He also fined Daley $5,000 on each of the five Landrum-Griffin Act violations. The defendant has not appealed from the judgments of conviction on these five counts but has limited his appeal to the convictions under the Hobbs Act contained in the first two counts of the indictment.[2]

## I

Since 1956 the appellant Daley has been Secretary-Treasurer, or principal officer, of Teamsters Local 445 (Local) which has several thousand members and a territorial jurisdiction which embraces the counties of Westchester, Putnam, Dutchess, Rockland, Ulster, Orange and Sullivan in the State of New York. The evidence presented by the Government indicated that in the summer of 1971 Daley requested Anthony Alecca, Jr., the President and number two officer of the Local, to obtain for him some stone for the purpose of constructing a driveway for Daley's camp or mountain cabin in Windham, New York. Alecca then approached Thomas Turco, who was a superintendent for Hudson Cement in Kingston, New York, and requested approximately ten loads of stone for Daley's use. Turco in turn discussed the matter with his superior Robert Greene, general manager of Hudson Cement, an employer which was then in contract negotiations with Local 445. Greene decided to provide Daley with a

1. Anthony Alecca, Jr. and Thomas Clausi were named as unindicted coconspirators in the indictment.

2. Under the concurrent sentence doctrine as a matter of discretion this court could refuse to review the validity of the convictions in a multicount indictment when the conviction on one count was proper and concurrent sentences have been imposed, *Benton v. Maryland,* 395 U.S. 784, 787–91, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *United States v. Beverly,* 562 F.2d 201, at 204 (2d Cir. 1977). Here Daley has not appealed his convictions of the five misdemeanor counts and concurrent sentences have been imposed. However, both the appellant and the Government agree that the doctrine should not apply where it may involve possible adverse collateral effects upon the appellant. *Benton v. Maryland, supra,* 395 U.S. at 790 and n.5, 89 S.Ct. 2056 (1969). Here the convictions under the Hobbs Act are felonies which create a number of penalties under State law not invoked against those who are found guilty of misdemeanors. In addition, Daley's convictions under the Hobbs Act clearly bar him from serving as an official of a labor union for a specified period. 29 U.S.C. § 504. Whether the misdemeanor convictions under Landrum-Griffin would create a similar bar is not settled and we take no position on that issue.

couple of loads of stone in order to avoid any union problems. Daley was then advised through Alecca that Hudson Cement would supply the stone. The next step was to obtain the equipment and personnel for the project. Alecca instructed Thomas Clausi, the Local 445 shop steward on a project to repair the New York State Thruway near Kingston, to arrange for the trucks and truckers. Alecca told Clausi to have two Local 445 owner-operators provide dump trucks and drivers to load and haul the stone after working hours. Eventually, stone was delivered to Daley's cabin on three separate occasions: September 3, 4 and 11, 1971.

In all, thirty to thirty-six truck loads of stone totalling about 600 tons were delivered by union drivers to Daley's cabin. Some ten to fifteen ten-wheel dump trucks, a tractor trailer and other equipment supplied by Local 445 owner-operators and contractors who employed union members were used to make the deliveries. The stone was then selling at a delivered price of nine dollars per ton at Windham, which was 60 miles distant from Kingston where the stone was located. On none of these trips were the drivers paid for their labor or the truck owners for the use of their equipment or fuel.[3] Hudson Cement received no reimbursement for the stone it supplied.

The record amply demonstrates that Daley was fully aware of the arrangement, directed where the stone was to be placed and was insistent that sufficient stone be delivered to satisfy his needs.

Clausi testified that in making the arrangements for the stone deliveries he was just following orders. He also testified to his belief that if he or the union members had refused to make the hauls they would not have received work. One owner-operator testified that he made a delivery to insure his job. Another, Robert Kozlowski, testified that he agreed to the hauls so that his drivers would not lose work. Kozlowski further testified that in March, 1974, after the investigation into this matter had begun, Daley told Kozlowski that he could put Kozlowski's four trucks to work but would not do so. Several Local 445 drivers also testified that they made deliveries only because Clausi threatened that they would lose their jobs if they refused.

In addition to the stone, Daley later advised Clausi that he needed some twelve-inch by twelve-inch wooden beams. Clausi secured some twenty to twenty-five painted beams from the Maggiola Construction Company. The beams were hauled to Daley's cabin from Pearl River, some sixty miles south of Kingston, by an employee of Callanan Industries, the contractor on the Kingston Thruway job. The employee was paid for his services by Callanan. An additional twenty-two beams costing $34 to $35 each were provided by Callanan Industries and were delivered to Daley's cabin by a Local 445 driver on Callanan's payroll. Daley again had instigated the delivery of the beams and had helped unload one shipment. No payment was made for the beams.

Daley testified in his own defense, taking the position, in substance, that the stone delivery was Alecca's idea and that he believed the stone was waste material. He further testified that the delivery of the beams was a complete surprise and that he kept them at Alecca's request. Daley denied that he asked Clausi for additional stone after the first delivery on September 3, and claimed that he paid Alecca $700 or $800 to distribute among the truck drivers.

Daley also called a number of witnesses. Chester Davis, the current President of the Local, testified that he overheard a conversation between Daley and Alecca concerning the trucking of material to Windham, during which discussion Daley gave Alecca money. Raymond Ebert, another union official, testified that although Daley was the union boss he did not control which union

---

3. There was testimony that in the Kingston community where most of the drivers lived it was not unusual for Local members to lend their trucks to close friends for short hauls of two or three miles. Daley, however, lived in Wappingers Falls, thirty miles from Kingston. He was not a member of the local community nor was he personally acquainted with the drivers.

members worked. One Local owner-operator and three of his drivers testified that they made the deliveries to Daley's cabin without fear of reprisal if they did not participate. Two of these witnesses testified that the material they delivered to the cabin was waste although this was contradicted by their prior testimony before the Grand Jury.

Clearly the evidence at trial presented issues of credibility which the jury resolved adversely to the defense.

## II

On this appeal Daley argues that the trial evidence was legally insufficient to establish a Hobbs Act violation.

■ A. The first contention made by the appellant is that the acts alleged and proven at the trial had insufficient impact on interstate commerce to fall within federal jurisdiction. We commence with the premise that the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960).

The pertinent language of § 1951(a) is indicative of the congressional intent. "Whoever *in any way or degree* obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . " is in violation of the Act (emphasis added). Construing this language, this court has held that "[s]tated differently, extortion or threats of violence need affect interstate commerce only in a minimal degree to constitute a violation." *United States v. Tropiano,* 418 F.2d 1069, 1076 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). "[I]t is enough that the extortion in any way or degree [citation omitted] affects [interstate] commerce, though its effect be merely potential or subtle." *United States v. Augello,* 451 F.2d 1167, 1169–70 (2d Cir. 1971), cert. denied, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802

(1972). Furthermore, it is not necessary that the purpose of the extortion be to affect interstate commerce. *United States v. Varlack,* 225 F.2d 665, 672 (2d Cir. 1955). It is sufficient that one of the natural effects of the offense is an obstruction of that commerce. *United States v. Addonizio,* 451 F.2d 49, 77 (3d Cir.), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

■ Here the victims of Daley's scheme of extortion were workers and contractors on the New York Thruway, a major artery of interstate commerce. The threats which forced compliance were the loss of continued opportunities to work on that interstate highway. The jurisdictional requirement of the Hobbs Act has been held to be satisfied merely by the exaction of tribute from local contractors erecting facilities to serve an industry engaged in interstate commerce. *United States v. Addonizio, supra,* 451 F.2d at 76–77. A fortiori, extortion directed at those constructing part of an interstate highway, which is an instrumentality of interstate commerce, falls within the jurisdictional scope of the Hobbs Act. The requisite impact on interstate commerce has also been found where the resources of a business engaged in interstate commerce are diminished by extortion, thereby permitting the inference that as a consequence of the extortion the operations of the business have been delayed, obstructed or in some way affected. *United States v. Mazzei,* 521 F.2d 639 (3d Cir.), cert. denied, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Augello, supra,* 451 F.2d at 1170; *United States v. Tropiano, supra,* 418 F.2d at 1076–77. Here evidence demonstrated that Hudson Cement and Callanan Industries, two of the principal victims of Daley's scheme, were engaged in interstate commerce: Hudson, through its out of state shipments of cement, and Callanan, through its construction work on the New York Thruway. Clearly, the resources of both companies were depleted by the extortion. The consequent impairment of their ability to carry on business in interstate commerce also brings Daley's offense within the ambit of

**650**

the Hobbs Act.[4] We hold therefore that there was a sufficient interstate nexus established to support the conviction.

B. Appellant urges that there was insufficient evidence to establish "reasonable fear" in the minds of the victims as is required for a Hobbs Act conviction. *United States v. Rastelli,* 551 F.2d 902 (2d Cir.), cert. denied, —— U.S. ——, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977). The Hobbs Act, § 1951(b)(2), provides that the "term extortion means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." There is no claim made that the jury was improperly charged. What we said in *Rastelli* is applicable here:

> Essentially appellants are attempting to reargue the evidence, urging upon us as facts what are basically inferences favorable to the defendants but which were rejected by a properly instructed jury. It is basic that we must view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Under this test appellants must fail.

Id. at 905.

■ A reading of the record here reveals testimony by both employees and employers of Local 445 that they would lose their jobs or that their business would be injured if they failed to comply with Daley's requests transmitted through his agents and the named but unindicted co-conspirators, Alecca and Clausi. Daley was the principal

officer of the Local for fifteen years and there was evidence of his power to influence adversely the economic interests of both union members and employers. The materials involved here were substantial and were provided at considerable expense of time, effort and money by the victims of Daley's extortion. While there was testimony by some that they complied willingly with Daley's demands, their credibility was a matter for the jury to determine. We have no difficulty in finding that there was sufficient evidence to justify a finding that there were victims who complied with Daley's demands out of a reasonable fear of retaliation if they failed to do so. Again it was the jury's prerogative to reject the defense contention that the benefits bestowed on Daley, the sole beneficiary of these transactions, were prompted by friendship for an innocent and unwitting donee.

■ C. Appellant argues that Daley's activities must amount to "racketeering" before a Hobbs Act violation can be established. The contention is totally without merit. This court, in recently upholding a Hobbs Act conviction based on a single incident of commercial bribery by the purchasing agent of a private corporation, explicitly rejected the concept that the Hobbs Act definition of extortion is limited to prosecutions involving organized crime. *United States v. Brecht,* 540 F.2d 45, 52 (2d Cir. 1976), cert. denied, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977).[5] Moreover, the

---

4. Appellant's contention that *United States v. Merolla,* 523 F.2d 51 (2d Cir. 1975) precludes the application of the "depletion of assets" theory in this case is incorrect. The victim in *Merolla* was not a professional contractor but rather entered a "one shot deal" to build an auto showroom for the defendant. *Addonizio, supra,* was distinguished in *Merolla* on the basis that the victim there was not maintaining an "ongoing business" in interstate commerce. Id. at 55. Here Callanan was engaged in the construction of a highway to serve interstate commerce and Hudson Cement made shipments in interstate commerce.

Appellant also urges that in light of *Merolla* it was error for Judge Lasker to charge the jury that a potential rather than an actual effect on interstate commerce satisfied the jurisdictional

requirement of the Hobbs Act. The argument is without merit. Aside from the factual distinctions between the cases, the charge given fully accords with our holding in *United States v. Augello, supra,* 451 F.2d at 1170. Moreover, *Merolla* did not purport to alter the rule that a potential effect on interstate commerce brings an offense within the scope of the Hobbs Act. See *United States v. Merolla, supra,* 523 F.2d at 55.

5. Daley's argument that the Hobbs Act proscribes only organized racketeering activity is premised on two cases, *United States v. Culbert,* 548 F.2d 1355 (9th Cir.), cert. granted, —— U.S. ——, 98 S.Ct. 53, 54 L.Ed.2d 71 (1977); *United States v. Yokley,* 542 F.2d 300 (6th Cir. 1976). However, neither case involved the ille-

corrupt abuse of the power of a union official in our view is precisely the type of activity which the Act was designed to embrace, see, e. g., *United States v. Enmons*, 410 U.S. 396, 400, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973); and cases cited in *United States v. Brecht, supra,* 540 F.2d at 51, and indeed is a form of labor racketeering.

### III

■ Appellant makes other arguments which we find unpersuasive. In 1970 Judge Lasker presided over a civil trial involving a claim of an unfair labor practice against Local 445. Daley and Local official Raymond Ebert, both of whom testified in Daley's defense in the trial below, were witnesses in that proceeding. In the civil case Judge Lasker stated that it was impossible to reconcile the testimony of Daley and Ebert, the only two witnesses for the Local in that action, without finding that one of them had been untruthful. Ten days after commencement of the present criminal trial and seven months after assignment of the case to Judge Lasker, Daley made a motion for recusal which was denied by Judge Lasker. The motion was properly denied. There was no showing or even suggestion that Judge Lasker had the "personal bias" required by 28 U.S.C. §§ 144, 455(b)(1). *United States v. Wolfson,* 558 F.2d 59, 62 (2d Cir. 1977).

Even under the broader standard of the new § 455(a), which provides that a judge shall disqualify himself in a proceeding where "his impartiality might reasonably be questioned," [6] Judge Lasker properly denied the motion for recusal. Of course it is most significant that the alleged prejudice appellant complains of here originated only in a prior judicial ruling. See *United States v.*

*Bernstein,* 533 F.2d 775, 784–85 (2d Cir.), cert. denied, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). There may be instances in which a judge's behavior during prior judicial proceedings can demonstrate sufficient friction between the judge and the complaining party to support a finding of bias, see *Wolfson v. Palmieri,* 394 F.2d 121, 124–25 (2d Cir. 1968); 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3542 at 352–53, but such was certainly not the situation in this case. In fact, Daley makes no specific allegations that Judge Lasker conducted *either* trial in a manner which even faintly suggested bias on his part. Appellant's position is also undermined by Daley's protracted delay before moving for recusal in the district court, despite his actual knowledge of a prior judicial encounter with Judge Lasker. See *Duffield v. Charleston Area Medical Center, Inc.,* 503 F.2d 512, 515–16 (4th Cir. 1974). Defense counsel's protestations that he was unaware of Judge Lasker's previous involvement with Daley are unconvincing since the facts were clearly known to Daley himself and, as a matter of public record, were at all times ascertainable by counsel. See *Hirschkop v. Virginia State Bar Association,* 406 F.Supp. 721, 724 (E.D.Va.1975). Moreover, the same firm that represented Local 445 in the civil action assisted the preparation of Daley's defense below. Appellant's motion was also rendered untimely by the fact that ten days of trial, with all the attendant expenditure of judicial resources, preceded the recusal motion. See *Smuck v. Hobson,* 132 U.S.App.D.C. 372, 408 F.2d 175, 182–83 (1969). Under these circumstances, appellant can hardly maintain that Judge Lasker's impartiality could reasonably be questioned.[7] Cf. *United States*

---

gitimate labor union activities encountered here, which the Hobbs Act was mainly designed to thwart. *United States v. Enmons,* 410 U.S. 396, 400, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973); *United States v. Brecht, supra,* 540 F.2d at 51.

**6.** 28 U.S.C. § 455(a) provides: "Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in

any proceeding in which his impartiality might reasonably be questioned."

**7.** The result is the same here whether the reasonableness of the objection to Judge Lasker's impartiality is viewed from Daley's perspective or from that of a disinterested observer. See *United States v. Cowden,* 545 F.2d 257, 265 (1st Cir. 1976), cert. denied, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977); *Parrish v. Board of Commissioners of Alabama State Bar,* 524

v. Wolfson, supra; United States v. Cowden, 545 F.2d 257 (1st Cir. 1976), cert. denied, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977).

We further find that the record supports the introduction of hearsay statements by Alecca and Clausi, Daley's unindicted co-conspirators. The Government need only establish by a fair preponderance of the evidence independent of hearsay statements, that Daley was a participant in the conspiracy. United States v. Stanchich, 550 F.2d 1294, 1297–98 (2d Cir. 1977). The evidence set forth in Part I of this opinion amply attests to Daley's continuing demands upon his victims and his awareness of the source and nature of the benefits obtained. The submission of the conspiracy count to the jury under the standard set forth in United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972) was entirely proper in our view. A jury could fairly find guilt beyond a reasonable doubt here on the basis of the inferences they might justifiably have drawn from the evidence and their determination of the credibility of the witnesses.[8]

■ Appellant's arguments regarding improprieties in the proceedings before the Grand Jury have been waived since they were not raised before trial as required by Fed.R.Crim.P. 12(b)(2). United States v. McGrath, 558 F.2d 1102, 1105–06 (2d Cir. 1977); United States v. Blitz, 533 F.2d 1329, 1344 (2d Cir.), cert. denied, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976). Moreover, appellant's arguments are meritless. United States v. Marchand, 564 F.2d 983, at 1001 n.29 (2d Cir. 1977).

We have carefully considered the other matters raised by appellant and have found them also to be without merit.

The judgment of conviction is therefore affirmed.

F.2d 98 (5th Cir. 1975) (en banc), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

**8.** The standard of United States v. Taylor, supra, is

"whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."
Id. at 243.