UNITED STATES of America, Appellee,

v.

Jabri JAMISON, Defendant–Appellant.

Docket No. 01–1483.

United States Court of Appeals, Second Circuit.

Argued: May 22, 2002.

Decided: Aug. 5, 2002.

Alexander Bunin, Federal Public Defender, Northern District of New York and Vermont, Albany, NY, for Jamison.

Barbara D. Cottrell, Assistant United States Attorney, Northern District of New York (William C. Pericak, Assistant United States Attorney on the brief) for Joseph A. Pavone, United States Attorney, Northern District of New York, Albany, NY.

Before McLAUGHLIN, JACOBS, and LEVAL, Circuit Judges.

JACOBS, Circuit Judge, dissents by separate opinion.

LEVAL, Circuit Judge.

Defendant Jabri Jamison appeals from a judgment of the United States District Court for the Northern District of New York (Scullin, *J.*) convicting him, following a jury trial, of unlawful possession of a firearm by a convicted felon, 18 U.S.C. § 922(g); attempted robbery, 18 U.S.C. § 1951(a) (the "Hobbs Act"); and use of a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c). On appeal, Jamison contends (1) the evidence did not show a sufficient effect on interstate commerce to satisfy the jurisdictional element of the Hobbs Act; and (2) the district court erred in instructing the jury that a minimal effect on interstate commerce would satisfy the jurisdictional requirement of the Hobbs Act, where the victim was an individual and not a business entity. We reject Jamison's contentions and affirm the judgment of conviction.

## BACKGROUND

This prosecution arises out of an attempted murder and robbery occurring on January 8, 2000, at the house of one Andre Porter, at 414 Brandywine Avenue in Schenectady, New York. Viewing the evidence in the light most favorable to the government, *see United States v. Mapp*, 170 F.3d 328, 331 (2d Cir.1999), the evidence presented at trial was as follows.

Porter, whose street name is "Boogaloo," was a part owner of an incorporated

retail business in Schenectady called Digital Underground Fashions, which sold clothing, shoes, beepers, cell phones, CDs, and tapes. On January 8, 2000, Porter visited outlet stores in Woodbury, New York, carrying approximately $18,000 in cash to purchase merchandise for his store. He purchased approximately $15,000 in goods. He brought the merchandise back to his house in Schenectady around 6:00 p.m, with $3,310 remaining in his pocket.

In addition to operating a retail business, Porter also trafficked cocaine. He typically purchased four to five ounces of cocaine at a time, at up to $900 per ounce, applied a cutting agent to dilute its purity, and sold it in quantities between half a gram and 3.5 grams. He regularly commingled cash from his cocaine transactions with the proceeds of his retail store. In addition to the cash he had taken to Woodbury, Porter had approximately $18,000 in cash in a safe inside his house.

Later that evening, the defendant, Jabri Jamison, appeared with an unidentified man at Porter's house. When Porter opened the front door, Jamison, who had never before met Porter, asked whether "Boogaloo" was home. When Porter answered, "yes, right here," Jamison pointed a gun and shot him. The bullet penetrated Porter's wrist, passed through his elbow, pierced his side, and lodged in his back.

Jamison and the unidentified man entered the house, and the other man pointed a gun at Porter's girlfriend. Jamison grabbed a gold and diamond chain hanging around Porter's neck, and asked, "Where's the money." Porter threw the chain to the floor and directed Jamison toward the back of the house. At this point, Porter's niece, Tenecia Jackson, rushed to the front of the apartment and began struggling with Jamison. Jamison lost control of his

gun. He tried to escape through the front door, but several neighbors rushed to the scene and restrained him until police arrived and arrested him.

Soon after this incident, Porter moved to 406 Bedford Road in Schenectady. On January 27, 2000, nearly three weeks after the incident, he was arrested by Drug Enforcement Administration ("DEA") agents on federal drug and money laundering charges. Agents obtained search warrants for Porter's current residence at 406 Bedford Road, as well as his prior home. At 414 Brandywine Avenue, the agents found a safe and two firearms. At 406 Bedford, the agents found nearly $20,000 in cash, a gun, ammunition, and approximately eight-and-a-half ounces of cocaine.

On June 8, 2000, in proceedings in the Northern District of New York, Porter pleaded guilty to conspiring to distribute cocaine and to money laundering. Porter had at least two prior narcotics-related convictions within the last 12 years. In his allocution, he admitted that between 1998 and 2000 he purchased approximately 600 grams of cocaine per month at $800–900 per ounce, and had "personally distribut[ed] approximately 14 kilograms of cocaine."

At Jamison's trial, to satisfy the jurisdictional element of the Hobbs Act, which requires proof of an effect on interstate commerce, the government relied on the effect the robbery would have had on Porter's clothing and narcotics businesses. As noted, Porter, who commingled the funds of both businesses and his personal cash, had nearly $18,000 in cash located in a safe in his house, and $3,310 on his person. The government's theory was that Jamison's attempted robbery, if successful, would have depleted cash that Porter regularly used to purchase items in interstate

commerce as inventory for his clothing and cocaine businesses.

As to his clothing retail business, the evidence showed that Porter's inventory items were manufactured in Asia, Guatemala, California, Massachusetts, and Maine. With respect to Porter's cocaine enterprise, the government elicited testimony from a DEA agent that cocaine generally comes to New York from South and Central America, and that all cocaine originates outside the State of New York.

At the close of evidence, the district court provided the following jury instruction on the government's obligation to show an effect on interstate commerce:

> Third element, to obstruct, delay, or affect commerce, or the movement of any article or commodity in commerce, in any way or degree, includes interference or attempted interference in any manner whatever, even when the effect of such interference or attempted interference is minimal or *de minimis,* which means minimal.

> It is not necessary that the robbery had been successful, or that anything have been taken, in order for the statute to have been violated. In the case of an attempt, all that need be shown was the possibility of an effect on interstate commerce, not an actual effect.

> Furthermore, it is not necessary that the defendant have the intent to interfere with interstate commerce; it is sufficient that one of the effects of the offense is an obstruction of that commerce. This nexus with interstate commerce may be satisfied under the so-called depletion of assets theory, where the defendant's illegal acts deplete the victim's assets, therefore affecting the victim's ability to purchase commodities that travel in interstate commerce.

> Now where the victim of an attempted robbery customarily obtains articles through interstate commerce, the diminution of the victim's resources impairs his purchasing power and may therefore be found to affect interstate commerce, for the purpose of satisfying this element.

> Here, the Government contends that a successful robbery would have depleted Andre Porter's assets in two types of interstate commerce, the retail clothing business, and the buying and selling of cocaine.

> With respect to the retail clothing business, if you find that a successful robbery would have prevented the use of that money in purchasing articles which travel through interstate commerce, you may find that this element is satisfied.

> With respect to the business of buying and selling cocaine, cocaine is a commodity, albeit illegal, about which you have heard testimony. Agent James DiCaprio of the DEA testified that cocaine comes from outside of New York and, therefore, would have to travel in interstate commerce when it is found in New York. If you find that a successful robbery would have prevented the use of money which was to be used to purchase cocaine, then you may also find this element satisfied.

Jamison was convicted on all three counts, and the district court sentenced him to a total term of imprisonment of 198 months. He now appeals.

## DISCUSSION

The Hobbs Act makes robbery or extortion (or attempt or conspiracy to rob or extort) a federal crime if that conduct "in any way or degree obstructs, delays, or affects commerce or the movement of any

article or commodity in commerce." [1] 18 U.S.C. § 1951(a). The Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Proof that commerce was "affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." *Id.* at 218, 80 S.Ct. 270; *see also United States v. Elias,* 285 F.3d 183, 188 (2d Cir.2002). We have long recognized that the requirement of showing an effect on commerce involves only a minimal burden of proving a connection to interstate commerce, and is satisfied by conduct that affects commerce " 'in any way or degree.' " *See id.* at 187–88 (quoting 18 U.S.C. § 1951(a)); *see also United States v. Arena,* 180 F.3d 380, 389–90 (2d Cir.1999). The requirement "may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect on commerce will suffice." *See United States v. Angelilli,* 660 F.2d 23, 35 (2d Cir.1981) (internal citations omitted); *see also Jund v. Town of Hempstead,* 941 F.2d 1271, 1285 (2d Cir.1991) ("[A]ny interference with or effect upon interstate commerce, whether slight, subtle, or even potential ... is sufficient to uphold a prosecution under the Hobbs Act.").

Contrary to Jamison's assertion, we have repeatedly held that the Supreme Court's decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), to the effect that Congress exceeded its Commerce Clause powers in establishing gun-free school zones in 18 U.S.C. § 922(q)(1)(A), does not raise the *de minimis* threshold for satisfying the jurisdictional element of the Hobbs Act. *See Arena,* 180 F.3d at 390; *United States v. Farrish,* 122 F.3d 146, 148 (2d Cir.1997) ("We now expressly hold that *Lopez* did not raise the jurisdictional hurdle for bringing a Hobbs Act prosecution.").

Jamison makes two arguments supporting his contention that the government failed to show the necessary effect on commerce. First, he contends the government failed to demonstrate that the robbery, had it been successful, would have affected interstate commerce, as the evidence did not allow the inference that Porter intended to use the money in his possession to purchase goods in interstate commerce. Second, Jamison contends the district court erred in instructing the jury that a minimal effect on interstate commerce would suffice. He argues that where the robbery victim is a private individual, rather than a business, the robbery is less likely to affect commerce, and the government must therefore show a "substantial" effect, rather than a minimal effect. *See United States v. Wang,* 222 F.3d 234, 238–

---

1. The Hobbs Act provides in pertinent part:

    (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

    (b) As used in this section—

    (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

    18 U.S.C. § 1951.

39 (6th Cir.2000) (holding that for a robbery of a private citizen to support a prosecution under the Hobbs Act, a substantial connection between the victim and interstate commerce is required). We find both contentions without merit.

## A.

█ Porter's testimony indicated that he commingled the moneys coming to him from all sources to be used for all purposes. He testified he intended to use the approximately $21,000 he had in cash on January 8 for "drugs or clothing, whatever." Jamison focuses on Porter's indication that he might have used the money to purchase "whatever." Jamison construes this to mean that Porter would use the funds for his personal expenditures, rather than to acquire inventory for his businesses.

The problem with Jamison's argument is that it construes the evidence in the light most favorable to himself, rather than in the manner most favorable to the government. His reading is contrary, furthermore, to the most reasonable reading of the evidence.

The import of Porter's testimony was that on the day of the robbery attempt, he had gone to the Woodbury outlet stores carrying approximately $18,000 in cash to be used to purchase inventory for his clothing retail business; he used approximately $15,000 for that purpose and had $3,310 left over in his pocket at the time of the robbery. In addition, at the time he had $18,000 in cash in the safe in his house. Thus, prior to making his Woodbury purchase, he had approximately $36,000 in cash. He maintained the cash in commingled fashion, using it to purchase clothing inventory for the clothing business, drug inventory for the drug selling business, and for personal expenses. Notwithstanding that his use of the word "whatever" permitted the inference that some of the large cash sums he maintained might be used for personal expenses, the clear import of his testimony was that he used those sums primarily to purchase business inventory for both businesses. The jury could draw the inference that, had Jamison's robbery attempt succeeded in depriving Porter of the $21,000 cash he had on hand at his house, this would have substantially diminished his inventory purchases of clothing manufactured in Asia, Guatemala, California, Massachusetts, and Maine, and cocaine originating outside the State of New York.

█ This evidence fairly showed that the robbery, if successful, would have had a significant effect on interstate commerce. Jamison's argument that the robbery would have impaired only Porter's personal consumption and not the purchases of articles in commerce as inventory for Porter's businesses does not fairly reflect the evidence, much less does it respect the rule that, when a convicted defendant argues insufficiency of the evidence, the evidence must be construed in the manner most favorable to the government, drawing all inferences that may reasonably be drawn against the defendant.[2] *See Jack-*

2. In response to Judge Jacobs, this case does not require us to consider, or answer, whether a more exacting standard for demonstrating effect on commerce should apply in the case of the robbery of an individual than in a case of robbery of a business. As shown above, the victim in this case, Porter, was the operator of two businesses, who kept large amounts of cash at home that he used to operate his businesses. On the day of the robbery, he had taken $18,000 of this cash on a buying trip to purchase inventory for his retail business. Of that sum, $3,000 remained in his pocket at the time of the robbery.

When asked the intended use of these funds, he answered, "[D]rugs or clothing,

*son v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Mapp,* 170 F.3d 328, 331 (2d Cir.1999).

### B.

Jamison's second argument is that a different rule of law applies to robberies of an individual, from the rule that applies in the case of robberies of a business. Jamison acknowledges the well-established rule that a robbery or extortion that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the Hobbs Act by a minimal showing of effect on commerce. *See, e.g., Elias,* 285 F.3d at 189 (robbery of grocery store affected its ability to purchase beer produced outside the United States and fruit grown outside New York); *United States v. Calder,* 641 F.2d 76, 78 (2d Cir.1981) (extortion of a New York bar depleted its assets from which it could purchase food and other items from New Jersey and Canadian suppliers); *United States v. Daley,* 564 F.2d 645, 649 (2d Cir.1977) ("The requisite impact on interstate commerce has ... been found where the resources of a business engaged in interstate commerce are diminished by extortion, thereby permitting the inference that as a consequence of the extortion the operations of the business have been delayed, obstructed or in some way affected.").

Citing decisions from other circuits, Jamison argues that where the robbery or extortion is of an individual, as opposed to a business, there is less likelihood of an impairment of commerce, and the government should consequently be obligated to make a more substantial showing of effect on commerce. *See, e.g., Wang,* 222 F.3d at 238, 239–40 (6th Cir.) (reversing Hobbs Act conviction for robbery of restaurant owners in their private residence of over $4,000, of which $1,200 belonged to the restaurant, and holding that where "the criminal act is directed at a private citizen, the connection to interstate commerce is much more attenuated" and therefore the government must show a substantial connection between the victim and interstate commerce); *United States v. Quigley,* 53 F.3d 909, 910–11 (8th Cir.1995) (finding evidence of impact on interstate commerce insufficient to support Hobbs Act conviction for robbery of two private individuals and noting that robberies "normally have a lesser effect on interstate commerce when directed at individuals rather than businesses"); *United States v. Collins,* 40 F.3d 95, 99–100 (5th Cir.1995) (noting that robbery and extortion are "likely to have a greater effect on interstate commerce when directed at businesses rather than individuals" and that criminal acts targeting individuals may violate the Hobbs Act only if: "(1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate com-

---

whatever." To be sure, the "whatever" part of his answer could have meant "suit yourself" or "you care, but I don't." But, as Judge Jacobs concedes, the "drugs or clothing" part of the answer referred to his intention to use at least a portion of the funds to purchase inventory for his businesses, as he had indeed done with $15,000 the very same day.

Given all the facts reviewed above, and taking them, as we must, in the light most favorable to the government, it is a wholly reasonable inference that Porter maintained $36,000 in cash at his home at least in part to stock his interstate businesses, and that the robbery of those funds would have significantly diminished his ability to purchase goods in commerce for those businesses. Robbing Porter at his home was no different in its effect on commerce from robbing a place of business.

merce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some cumulative effect on interstate commerce") (quotations and citations omitted); *see also United States v. Lynch*, 282 F.3d 1049, 1053 (9th Cir. 2002) (distinguishing between robbery of a business and robbery of an individual and adopting *Collins* test for determining *de minimis* effect on interstate commerce when robbery targets the latter). Jamison argues that because he robbed Porter at his home, the jury should have been required to find a substantial effect on commerce. He contends the court's instructions were incorrect because they allowed the jury to find satisfaction of the effect on commerce requirement "even when the effect of such interference [with commerce] . . . is minimal."

■ We need not consider the argument of law that Jamison advances because, even if we were to agree with his argument that the robbery of an individual depleting the individual's personal funds should be governed by a different test from a robbery that depletes the assets of a business, it would not affect the present case. This attempted robbery, if successful, would have taken the cash of two businesses operating in commerce.

Porter was operating an illegal cocaine trade. His cocaine business was not incorporated; it did not have offices or a bank account. Upon realizing cash from sales of cocaine, he kept the cash in his safe at his home. Porter also operated a clothing business. Although the clothing business was incorporated and operated out of a

store premises, Porter also kept its proceeds and working cash at his home in the same safe.

His purchases of inventory for both the cocaine and the clothing businesses were made with cash kept by Porter in his safe—cash generated from the proceeds of the clothing and cocaine businesses. It is therefore clear that if the robbery of Porter had succeeded in taking his money, this would have depleted the working capital of two businesses operating in interstate commerce by $21,000, significantly affecting their ability to make purchases in interstate commerce. Thus, it is not as if an attempt to rob Porter would have taken only his personal funds held by him for personal use.

■ We therefore need not resolve whether our *de minimis* rule should apply only to robberies of the assets of a business and not to robberies of an individual's personal funds. The robbery would have taken the cash assets of Porter's businesses.[3]

## CONCLUSION

The judgment of conviction is affirmed.

JACOBS, Circuit Judge, dissenting:

The government has prosecuted as a Hobbs Act violation the stick-up of a private person in his own home. As the majority opinion recognizes, there is a considerable issue as to whether a de minimis effect on interstate commerce is enough to establish federal jurisdiction in such a

---

**3.** Jamison also cursorily contends that the district court improperly admitted evidence of a prior crime. We find no merit in the contention. In his opening statement, Jamison's counsel asserted that the pistol with which Jamison shot Porter was Porter's pistol, putting at issue whether Jamison ever had an intent to commit a robbery or to possess a

weapon illegally. Under the circumstances it was not an abuse of discretion for the district court to admit evidence of a prior armed robbery which was relevant as evidence of Jamison's intent. *See* Fed.R.Evid. 404(b); *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir.1994).

case. Another circuit has held that the de minimis showing of interstate commercial impact that suffices for the robbery of a business is insufficient for the robbery of an individual at home because "the connection to interstate commerce is much more attenuated." *United States v. Wang*, 222 F.3d 234, 238–40 (6th Cir.2000)(when the government seeks to "demonstrate that the robbery of an individual had a 'realistic possibility' of affecting interstate commerce ... the required showing is of a different order than in cases in which the victim is a business entity."). *See also United States v. Collins*, 40 F.3d 95, 100 (5th Cir.1994) (reversing Hobbs Act conviction where defendant robbed executive of his car and cell phone, even though robbery likely prevented victim from attending business meetings and making phone calls). I respectfully dissent because I think that this rule is sound, and I would apply it in this case to reverse the conviction.

The majority has tried to sidestep this question by holding that because the victim here was a drug dealer who also had a shop that sold clothing (and beepers), and because he had $18,000 in his dwelling, the robbers were attempting to take "the cash of two businesses operating in commerce." Majority Op. at 12. I see no evidence that the object of the robbery was the capital (or inventory) of a business; for all the evidence shows, the $18,000 was just money.

According to the majority, the $18,000 represented the "commingled" funds of the victim's businesses (drugs, clothing and beepers) together with his personal cash. Majority Op. at 8. This observation amounts to less than may appear, because the verb "commingle" presupposes: [i] the initially separate character of several funds, an idea that (unsurprisingly) has no record support; and [ii] the mixing together of those funds (a mixing that would in any event refute rather than support the idea that any of the money retained the character of capital accounts for the victim's businesses). The victim did not say what amounts came from what sources or were dedicated to particular uses. It cannot be supposed that he was required to escrow or sequester any part of the money for specified purposes or accounts. Like most of us, he had money that he could expend as he needed or pleased. No one would say that an individual's checking account "commingles" the grocery money, the clothing fund and the mortgage, or that one's pocket money commingles a fund for newspapers with a fund for lunch. True, $18,000 is a lot of money to have around the house (and may seem so particularly to federal judges), but in light of the forfeiture laws, it makes sense that the victim in this case would avoid depositing his money in a bank for safekeeping.

Even if the proceeds of the drug, clothing and beeper businesses could be said to have been commingled with the victim's personal funds, the evidence failed to establish that the money in his safe on the night of the robbery represented the working capital of those businesses. The inference that it did rests wholly (and inadequately) upon the victim's response, when asked what he would have done with the money, that he would have spent it on "drugs or clothing, whatever."

This "whatever" testimony furnishes no basis for finding that the $18,000 was working capital of the victim's businesses as opposed to (say) the savings from those businesses or other activities, or recent business proceeds that he intended to spend, or the undifferentiated money of someone whose funds would be exposed to forfeiture if deposited in ·a bank. And even if the government is entitled to the inference that the "drugs [and] clothing" would be purchased for resale rather than

consumption, the use of the catch-phrase "whatever" drains the response of any meaning.

The majority reads the word "whatever" as a synonym for "et cetera" to reference personal expenditures. But the catch-phrase "whatever" can mean (and predominantly does mean) any or all of the following: "whatever you say," "whatever you want," "you tell me," "you care but I don't," "suit yourself," or "who knows?". The word is a shrug of indifference and indecision that specifies nothing and negates anything specific that precedes it.

In short, there is no testimony from the victim that will support, beyond a reasonable doubt, any inference as to how he was going to spend the $18,000. (Oddly, the majority seems to know more than the victim about his plans for this money.) I therefore think this appeal unavoidably presents the issue as to whether Hobbs Act jurisdiction can be based upon the de minimis impact on interstate commerce caused by the stick-up of a private individual in his own home. And I dissent because I believe that the answer to the question is no.