John L. JUND, Plaintiff–Appellant,

v.

The TOWN of HEMPSTEAD; The Town
of Hempstead Republican Committee;
The Nassau County Republican Com-
mittee, Defendants–Appellees.

No. 910, Docket 90–7857.

United States Court of Appeals,
Second Circuit.

Argued Feb. 1, 1991.

Decided July 26, 1991.

Town of Hempstead Republican Committee and Nassau County Republican Committee.

Before FEINBERG, MESKILL and CARDAMONE, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York, Mishler, J., granting judgment notwithstanding the jury's verdict. The district court ruled in favor of defendants Town of Hempstead (Town), Town of Hempstead Republican Committee and Nassau County Republican Committee (Committees) and dismissed John L. Jund's complaint alleging causes of action under Civil RICO, 18 U.S.C. § 1964, and civil rights claims arising under 42 U.S.C. § 1983. The dismissal of the complaint had the effect of vacating all prior judgments in favor of Jund. Jund contends the district court erred in granting j.n.o.v. and in dismissing his complaint.

The judgment of the district court is vacated. The 1989 and 1990 jury verdicts are to be reinstated, as is the 1989 award of partial summary judgment in favor of Jund. This action is remanded for further proceedings consistent with this opinion.

## BACKGROUND

This case has a long and complex history.

In 1970 John L. Jund, then nineteen years old, sought a position with the Town of Hempstead as a helper on a sanitation truck. Jund was advised to meet with his Republican Committee Block Captain, Ignazio Battalucco. Jund did so. Battalucco recommended that Jund see Harry Norwalk, the local Republican Committeeman. Norwalk told Jund that in order to get the position he sought, Jund would have to support the Republican Committee by selling football raffle tickets on a weekly basis. Jund agreed to sell the tickets and was promptly sent to see Donald Woolnough, then Assistant to the Chairman of the Town of Hempstead Republican Committee. Woolnough interviewed Jund and then sent him with a sealed letter to the Department of Sanitation. Jund was hired

Julian Kaplan, Mineola, N.Y. (Jessel Rothman, of counsel), for appellant.

Joseph Jaspan, Garden City, N.Y. (Holly Juster, of counsel), for appellee Town of Hempstead.

Edward J. Hart, Uniondale, N.Y. (Rivkin, Radler, Bayh Hart & Kremer, Uniondale, N.Y., John E. Ryan, Kwiatkowski & Ryan, Floral Park, N.Y., of counsel), for appellees

and began working as Sanitation Man I (helper) in May 1970.

In July 1972 Jund sought a promotion from Sanitation Man I to Sanitation Man II (driver). The position of driver also involves assisting in packing and loading the sanitation truck and moving material from the curb to the vehicle for loading. Sanitation Man II is lead man of the crew assigned to a particular route and is expected to aid in the manual tasks. Jund's foreman, Leon Busam, told Jund that he would have to make a contribution to the Republican Committee in the amount of one percent of his annual salary to get the promotion. Because his support for the Committee had been deficient in prior years, Jund was told to round his contribution up to $100. Upon producing a check for $100 payable to the Town of Hempstead, Republican Finance Committee, Jund was given keys to a sanitation truck and told to practice driving. Jund practiced for some time, and then acted as a part-time or substitute driver. Jund subsequently became a full-time driver with his own route. Jund requested the promotion and pay raise commensurate with the position, but in April 1973 he was told by his foreman, Frank Valenza, that not only would he be denied the promotion and pay raise, but also that he was being demoted to Sanitation Man I. When Jund asked for an explanation, he was told by Assistant Department Supervisor August Cosenza, his supervisor Theodore Howell, and Frank Cozzolino, a Civil Service Employees Association Union Representative, that he was being demoted because he did not actively support the Republican Party. Jund then visited Harry Norwalk, the Republican Committeeman, who confirmed the demotion.

On May 4, 1976 Jund suffered an injury to his back while picking up trash. He became disabled and could no longer perform the duties of Sanitation Man I.

On November 12, 1976 Jund requested an intradepartmental transfer to the Special Services Division of the Department of Sanitation and an interdepartmental transfer to Data Processing. Both positions involved work Jund could perform in spite of his injury. Sanitation Commissioner William Landman denied the transfers.

On May 18, 1978 the Town published a list of employees eligible for the positions of Sanitation Inspector I and Sanitation Inspector II based on competitive examinations given on December 13, 1975. The long delay in publishing the list of candidates resulted from unrelated litigation and the change in the administration of the Civil Service system from the Nassau County Civil Service Commission to the Town Civil Service Commission in 1970. Jund, who had taken and passed both exams, was ranked ninth on the Inspector I list and seventh on the Inspector II list. Several names appeared on both lists.

There were then eleven vacancies in the Town for Sanitation Inspectors which were to be filled from the appropriate eligibility lists. Two positions were filled by candidates who had permanent positions as Sanitation Inspector I, had taken and passed the promotional exam in 1975, and had been appointed to the position of Sanitation Inspector II.

Eleven applicants remained on the lists for nine positions. Of the eleven, seven were provisional employees, already occupying the position to which they aspired and awaiting formal appointment. It is the general policy of the Town that if provisionals pass the exam they are given a preference in appointment. Three of the provisionals held the position of Inspector II and four held the position of Inspector I. These seven were duly appointed, leaving two positions vacant, with four remaining candidates.

John Sandrowicz and Nathaniel Baldwin were appointed to the remaining Sanitation Inspector II positions. John Sandrowicz had been employed with the Sanitation Department for many years and had the highest score on the eligibility list. Furthermore, except for leave for military duty, Sandrowicz worked continuously for the Sanitation Department up until the time of his appointment to the new position. Sandrowicz was never asked to and never did contribute to the Republican Committees.

Nathaniel Baldwin had started work with the Sanitation Department as a helper. He is Black, and was expected to be assigned to a predominantly Black community where the Town claims he could more effectively perform the duties of sanitation inspector than could a white inspector. Nathaniel Baldwin was neither asked to nor did he ever contribute to the Republican Committees.

Two people remained on the eligibility lists, John Jund and James Heizman. Heizman had started with the Sanitation Department as a helper in 1970 and still held that position. Heizman was promoted to Sanitation Man II (driver) rather than sanitation inspector at the time of the appointments.

On July 28, 1978 Jund was placed on Separation and Leave of Absence effective October 3, 1978 because of his inability to perform the duties of Sanitation Man I (helper). This action was adopted by the Town board on October 3, 1978, and reserved for Jund the right, in accordance with Section 71 of the New York Civil Service Law, to request reinstatement to his position within one year after the termination of his disability.

On July 25, 1980 Jund sought to receive his accrued vacation benefits. He was told by Commissioner Landman that he would have to resign in order to receive the money. Jund was also informed that any resignation would be retroactive to the effective date of his separation leave. Jund resigned that day; in accordance with state law his resignation was retroactive to the date of his initial separation in 1978.

*Procedural History*

Much of the procedural history is set forth in our earlier opinion in this case, *Cullen v. Margiotta,* found at 811 F.2d 698 (2d Cir.), *cert. denied sub nom. Nassau County Republican Comm. v. Cullen,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). The following summarizes that history and outlines the relevant incidents that have occurred since the publication of that opinion.

On December 2, 1974 Jund, among others, was named as a plaintiff in a class action suit instituted in New York State Supreme Court, Nassau County, against the Nassau County Republican Committee and others. That complaint was subsequently dismissed.

On December 14, 1976 plaintiffs, including Jund, as a class filed the complaint in the instant action in federal district court naming as defendants, among others, the Town of Hempstead and the County and Town Republican Committees. The complaint asserted numerous claims including violations under section 1983 for employment discrimination in violation of the class' First Amendment rights, and civil RICO violations based on an alleged underlying scheme or plan to solicit contributions coercively from Town employees in the amount of one percent of their salaries. Damages were sought under 42 U.S.C. § 1983, and treble damages were sought on their RICO claims pursuant to 18 U.S.C. § 1964(c). The defendants moved to dismiss the complaint on several grounds including failure to state a claim upon which relief could be granted, res judicata or collateral estoppel because of the state court judgment dismissing the plaintiffs' previous action, and the statute of limitations. In a succession of orders over several years, the district court dismissed those portions of the complaint seeking relief directly under the Constitution and under state law. The district court found, however, that litigation of the section 1983 claims was not barred by the state court judgment. At one point the plaintiffs' RICO claims were dismissed, but they were subsequently reinstated. A three year statute of limitations was applied to the RICO claims, however, barring claims accruing before December 14, 1973. The court ordered a bifurcated trial for liability and remedies with the liability trial focused on conduct beginning January 1, 1973.

A jury trial was held in the summer of 1985 on the liability issues arising out of the section 1983 and RICO claims against the Town, Nassau County and the Committees. A detailed series of interrogatories was submitted to the jury dealing with each claim. The jury returned a verdict in

favor of the plaintiff class and Jund. The jury found that from January 1, 1973 to January 1, 1976 the Town and the Committees, but not the County, engaged in a practice and procedure of coercive solicitation of contributions from public employees, and the practice and procedure had become a custom and policy of the Town. The jury concluded that the plaintiffs had established that the Town and the Committees had violated the plaintiff class' First Amendment right of freedom of association. The jury also determined that the coercive practice and procedure underlying the section 1983 claim had not continued to the "relatively recent past." As to the RICO claims, the jury determined that the Town and the Committees were entities joined together to form an enterprise that had knowingly and willfully engaged in a pattern of illegal activities that affected interstate commerce.

The district court subsequently dismissed the RICO claims concluding that plaintiffs had failed to establish a necessary element of a civil RICO claim against the Town and Committees. The district court determined that in order for Jund and the class to prevail on its civil RICO claims, they had to allege that the Committees and the Town had been convicted of the alleged predicate acts and that the class had suffered a "racketeering injury." Because there had been no criminal conviction of the Town and Committees, the prior conviction allegation could not be made. Thereafter, however, the Supreme Court expressly rejected the district court's position concerning the need for convictions on the predicate acts in a civil RICO action in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Instead, the Supreme Court found that there was no prior conviction requirement, *id.* at 493, 105 S.Ct. at 3283, and no "racketeering injury" requirement. *Id.* at 495, 105 S.Ct. at 3284. The district court subsequently reinstated the civil RICO claims. The district court, looking toward the second stage of the trial, also redefined the class as "those public employees who made contributions during the period January 1, 1973 to January 1, 1976 and seek recovery of the sums

contributed, and those public employees who claim injury by reason of a refusal to make such payment demanded of them during the period."

Plaintiffs appealed from that decision. In our opinion in *Cullen*, 811 F.2d 698, we affirmed substantial portions of the district court's opinion. We also vacated those portions of the opinion dismissing the RICO claims against the Town, Town Committee and County Committee based on the jury's answers to interrogatories and noted that any remaining gaps in the jury's answers should have been filled by findings of the district court. Finally, we remanded the action to the district court to make

> factual findings as to (1) whether plaintiffs proved, by a preponderance of the evidence that the Town, or the Town Committee, or the County Committee participated, through the illegal racketeering activity found by the jury in the affairs of the RICO enterprise found by the jury, or (2) whether plaintiffs' trial evidence established any other civil RICO claim.

*Cullen*, 811 F.2d at 731–32 (internal citations omitted).

The district court subsequently entered a judgment finding that the defendant Committees had violated civil RICO, but that the Town could not have done so. In a February 1989 motion prior to trial, the district court granted summary judgment in favor of Jund for $2,257 on his section 1983 claim based on the 1973 through 1976 acts by the defendants. This amount was tripled under RICO resulting in a total award of $6,771. The amount of the award was based on the 1985 jury's finding that Jund was entitled to a promotion in 1973 to the position of Sanitation Man II (driver). Damages were ordered to cover the period from April 1, 1973, when Jund should have been promoted, to May 4, 1976, when Jund was injured on the job and no longer could work. The court determined as a matter of law that Jund's injury was a superseding cause cutting off Jund's damages on that date.

A trial with respect to the liability of the three defendants and the damages due

Jund for incidents that occurred after January 1, 1976 was held in 1989. Jund claimed he had been denied four positions as a result of the pre-existing coercive contribution scheme—the two requested transfers in 1976 and each of his applications for promotion to the Sanitation Inspector positions in 1978. The jury was required to determine whether the coercive contribution scheme in which the three defendants had participated from 1973 to January 1, 1976 had continued through July 1978 and whether Jund would have been given any of the four jobs sought but for the Town's and Committees' coercive contribution scheme. The court ruled that, in any case, all damages were cut off at the date of Jund's voluntary termination on July 25, 1980. The jury returned a verdict for the Town and the Committees on three of the four questions, but deadlocked on whether Jund had been denied improperly the position of Sanitation Inspector II.

This fourth question was retried before a jury in 1990. Defendants made a motion for a directed verdict before trial, which was denied. The jury in the 1990 trial was asked whether the coercive practice and procedure of the Town and Committees had continued to 1978 and whether Jund would have gotten the position of Sanitation Inspector II but for the improper action of the three defendants. The jury returned a verdict in favor of Jund, answering both questions in the affirmative.

On defendants' post trial motion, however, the district court directed entry of judgment n.o.v., vacating the jury's findings and dismissing Jund's claims, with costs to be paid to the defendants. The district court concluded that Jund had failed to present any evidence to support his claim that the coercive custom and practice had continued beyond 1976. The dismissal of Jund's claims also had the effect of vacating the partial summary judgment granted in favor of Jund in 1989 for $6,771 plus interest, costs and attorney's fees. This appeal followed.

On this appeal Jund claims that (1) the district court erred in finding, as a matter of law, that his damages arising out of the 1973 demotion terminated on the day he was injured, (2) the court erred in determining Jund's 1980 resignation to be voluntary, (3) the court erred in granting j.n.o.v., in concluding that Jund had failed to prove that the legitimate non-discriminatory reasons for failing to hire Jund in 1978 were pretextual, (4) the court erred in using a "but for" test in the 1989 and 1990 trials to determine whether the defendants had violated Jund's rights in failing to hire him, and (5) the district court erred in vacating the partial summary judgment award in its final judgment.

The Town of Hempstead claims that (1) there was no evidence that the coercive contribution solicitation scheme continued into 1976, (2) the inference that the scheme continued past January 1, 1976 does not establish the scheme as the Town's policy in 1978, (3) Jund's claims arising out of the 1976 and 1978 job denials should not have been admitted into evidence because they took place after Jund filed his complaint, (4) the defendants were improperly required to bear the burden of proof that the coercive contribution solicitation scheme did not continue, and (5) Jund was not prejudiced by the district court's use of the "but for" test.

The Committees join in the Town's third and fourth claims and contend that (1) the Committees as unincorporated associations cannot be held liable under section 1983 absent proof of membership ratification, (2) the Committees cannot be held liable under civil RICO because they are not "persons" under the statute, (3) application of RICO to the Committees violates their First Amendment rights to free political association and to solicitation of contributions, (4) Jund lacks standing to claim he was wrongly denied a promotion to Sanitation Inspector II, and (5) the district court did not err in cutting off Jund's potential damages in 1976 and in 1980.

## DISCUSSION

### A. The Partial Summary Judgment Award

In granting partial summary judgment in favor of Jund in 1989 the court found that

the Committees were liable under section 1983; the damage award was trebled because the Committees were also liable under RICO. The Committees now contend that neither section 1983 nor RICO covers their activities. The Committees' section 1983 challenge is two-pronged. First, the Committees challenge the district court's choice of law claiming that New York law on unincorporated associations should be applied. Second, if the Committees' position on New York law is accepted, the Committees challenge the sufficiency of the evidence. Specifically, the Committees claim that under New York law unincorporated associations are not amenable to suit absent proof of membership ratification of the wrongful acts.[1] The Committees claim that, because Jund made no attempt to prove unanimous membership ratification of the coercive contribution scheme, the damage award cannot stand.

### 1. *The Committees' Section 1983 Liability*

We are not persuaded by the Committees' claim that the district court applied the incorrect law. Under the Committees' argument, 42 U.S.C. § 1988 requires application of state law when federal law is deficient and provides no rule of decision for actions brought under section 1983.[2] Section 1983 states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the

United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. Because the statute does not discuss the substantive liability of unincorporated associations, the Committees urge that New York law must be applied with respect to suits against unincorporated associations. They rely for support on Supreme Court precedent holding that courts may "disregard an otherwise applicable state rule of law only if the state law is 'inconsistent with the Constitution and laws of the United States.'" *Board of Regents v. Tomanio*, 446 U.S. 478, 485, 100 S.Ct. 1790, 1795, 64 L.Ed.2d 440 (1980) (quoting 42 U.S.C. § 1988); *see Robertson v. Wegmann*, 436 U.S. 584, 588, 98 S.Ct. 1991, 1994, 56 L.Ed.2d 554 (1978).

■ Congress has instructed courts to look to 42 U.S.C. § 1988 for guidance when civil rights statutes do not, on their face, provide the relevant rule of decision. *Burnett v. Grattan*, 468 U.S. 42, 47, 104 S.Ct. 2924, 2928, 82 L.Ed.2d 36 (1984). Section 1988 sets forth a three-step process for federal courts to follow in borrowing a state rule of decision. *Id.* First, we must look to see if there are any applicable United States laws suited to effectuate the civil rights statutes. If there is no suitable federal law, we look to state common law as noted in the statutes and constitutions

---

**1.** The leading authority in New York on suits against unincorporated associations is *Martin v. Curran*, 303 N.Y. 276, 101 N.E.2d 683 (1951). *Martin* involved a libel suit against the officers of an unincorporated association in their representative capacity. The New York Appellate Division dismissed the suit as against the officers finding that there was no proof that the libel was authorized or ratified by the membership of the unincorporated association and absent such authorization or ratification there could be no liability. New York law maintains that an unincorporated association has no existence independent of its members, all liability is that of each member individually, *id.* at 280–81, 101 N.E.2d at 684–85, and the liability of each member must be alleged and proved. *Id.*

**2.** Section 1988 states, in pertinent part:

The jurisdiction in civil ... matters conferred on the district courts ... for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil ... cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause.

of the relevant states. Third, we apply state law only if it is not "inconsistent with the Constitution and the law of the United States." *Id.* at 47–48, 104 S.Ct. at 2928.

We disagree with the Committees' contention that federal law is deficient or leaves a gap that needs to be filled. Federal case law has confronted the issue of the substantive liability of unincorporated associations on several occasions. The Supreme Court has repeatedly recognized that unincorporated associations may be held liable under a theory of authorization in the absence of membership ratification, a position that has been accepted by the New York courts as well. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 931, 102 S.Ct. 3409, 3435, 73 L.Ed.2d 1215 (1982) ("To impose liability without a finding that the NAACP authorized—either actually or apparently—or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment."); *Cf. American Soc'y of Mechanical Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 570–74, 102 S.Ct. 1935, 1944–47, 72 L.Ed.2d 330 (1982) (*ASME*) (discussed infra). *See also Martin v. Curran*, 303 N.Y. 276, 279, 101 N.E.2d 683, 684 (1951) (indicating unincorporated association may be held liable for acts authorized by its members).

In *Claiborne*, the plaintiffs, white merchants, alleged that the NAACP was liable for their lost earnings that resulted from a boycott of their businesses by Blacks. The Supreme Court stated that "[t]he NAACP [an unincorporated association]—like any other organization—of course may be held responsible for the acts of its agents ... that are undertaken within the scope of their actual or apparent authority." *Claiborne*, 458 U.S. at 930, 102 S.Ct. at 3434 (footnote omitted). Although the Court ultimately found no liability on the part of the NAACP because neither authorization nor ratification was proved, the Supreme Court cited *ASME* as an example of a situation in which an unincorporated organization can be held liable for the acts of its agents. *Id.*

The Supreme Court in *ASME*, an antitrust action, used an apparent authority theory as a basis for predicating liability on a nonprofit membership corporation. There, members of ASME acted in their capacity as ASME representatives to damage Hydrolevel's reputation and competitive position in the market; liability was founded on the wrongdoers' apparent authority to act on behalf of ASME and to perpetrate the damage. The Supreme Court endorsed the use of an apparent authority theory as a basis for establishing liability, particularly in light of the existing alternative—imposing a requirement of proof of membership ratification. *ASME*, 456 U.S. at 572–73, 102 S.Ct. at 1946. The Court concluded that the theory of apparent authority was consistent with the underlying purposes of the antitrust laws and would best effectuate federal antitrust policy. The Court reasoned that application of a membership ratification theory would undermine the goals of the antitrust laws. *Id.* at 573, 102 S.Ct. at 1946.

The Supreme Court, in *United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), examined the substantive liability of trade unions, another form of unincorporated association. The Court rejected the argument that it was necessary to prove the guilt of every member of the union to hold the union and its treasury to answer. *Id.* at 391, 402, 42 S.Ct. at 576, 580. Instead, the Court found that there was ample evidence connecting certain named defendants to the wrongful strike, and further that the unions were engaged in an action, a strike, which was one of the chief instrumentalities for accomplishing the purpose for which the unions were organized. *Id.* at 402–03, 42 S.Ct. at 580. Although it was ultimately determined that there was no interstate commerce connection and the claims against the unions were dismissed, *see id.* at 409–11, 42 S.Ct. at 582–83, the reasoning of *Coronado Coal*, so similar to that applied in *Claiborne* and *ASME*, holds true today.

We find no barrier to application of the reasoning of *Claiborne*, *ASME*, or *Co-*

*ronado Coal* in the context of a section 1983 claim. In the instant action there was ample evidence connecting numerous Committee members to the coercive contribution scheme; proof of the participation of every member is not required, as it was not required in *Coronado Coal.* We note that the day-to-day operations of the Committees focus around fundraising and encouraging contributions, two of the chief instrumentalities for accomplishing the Committees' goal. Predicating liability on the theory of authorization will punish the entities responsible for the violations and effectuate the goals of section 1983 while a requirement of membership ratification would permit unincorporated associations to escape liability. These connections provide sufficient support for a finding of liability even in the absence of a finding of ratification by every member of the Committees.

This view is further strengthened by *American Bridge Div., U.S. Steel Corp. v. Int'l Union of Operating Eng'rs, Local 487,* 772 F.2d 1547, 1551 (11th Cir.1985) (per curiam). That court noted that while a union is not generally liable for the unauthorized acts of its members, it may be bound by the actions of its agents. The agents' actions need not be within their actual authority to find the union liable, but must be within the scope of their " 'general apparent authority' and be done on behalf of the union." *Id.* (quoting *North River Energy Corp. v. United Mine Workers,* 664 F.2d 1184, 1192 (11th Cir. 1981)). The reasoning of *American Bridge* is particularly applicable to the instant case. Committee members were re-

sponsible for the solicitation of funds and the collection of contributions. The Committees can be liable for the actions of their "agents"—the members responsible for solicitation—because in carrying out the coercive scheme they were working within the scope of their "general apparent authority," as the 1985 jury found, for the benefit of the Committees, not for their own personal benefit. *Id.; cf. Madden v. Atkins,* 4 N.Y.2d 283, 295–97, 174 N.Y.S.2d 633, 641–43, 151 N.E.2d 73, 79–80 (1958).

We feel that authorization as a basis for liability in this instance will better serve the policies that underlie section 1983.[3] Adopting such a theory of liability will encourage unincorporated associations to police their agents and their actions, an obligation of particular import in this case involving political patronage and its role in employment determinations. The very pervasiveness of the scheme, the Town's acceptance of it, and the dominant role the Committees played in Town hiring and promotion decisions all mandate application of a theory of liability other than membership ratification. There was ample support in the record for a jury finding of such authorization. Predicating liability on the Committees' clear authorization ensures that the wrongs perpetrated can be redressed.

While we believe that federal common law clearly applies to this action, we will address the Committees' contention that state law should be applied because the federal law, specifically section 1983, is deficient in this context. The law surrounding the interaction of section 1983 and section 1988 is far from well defined. *See* Eisenberg, *State Law in Federal Civil*

---

**3.** In this action the district court charged the 1985 jury on the theory of agency and apparent authority, and stated the following:

> The Nassau County Republican Committee and the Town of Hempstead Republican Committee are unincorporated associations consisting of various committeepersons elected by registered Republican voters in each election district. The County committeepersons in turn elect the officials of the Nassau County Republican Committee and the Town of Hempstead Republican Committee.
>
> Defendants act through the elected officials, and their servants, agents, and employees.

> They are not responsible for the acts of such officials, servants, agents or employees unless the act is in furtherance of the said municipal corporation or unincorporated association and within the scope of the employee's authority.

(Jury Charge, 1985 trial, September 3, 1985, volume 25). In order for the jury to return with a finding of a coercive solicitation scheme in which the Town and the Committees participated, the jury necessarily had to find that the officials who perpetrated the acts were acting in furtherance of the Town and Committees and within the scope of their authority, either actual or apparent.

*Rights Cases: The Proper Scope of Section 1988*, 128 U.Pa.L.Rev. 499, 499 (1980). Courts disagree over what constitutes a deficiency in federal law. *See id.* at 504–05, 508–15. We wish to make it clear that under any interpretation of deficiency as used in section 1988 New York law will not be applied, as we explain below.

Even if we accept the Committees' claim that federal law is silent on the substantive liability of unincorporated associations, New York law would not be applied. The New York Court of Appeals, while recognizing authorization as an alternative to ratification, has strongly asserted that liability cannot be imposed in the absence of authorization or ratification of the acts by all the members. *See Martin*, 303 N.Y. at 279–80, 101 N.E.2d at 684. The New York Court of Appeals, however, has taken great pains to carve out exceptions to this rule. *See Madden*, 4 N.Y.2d at 295–97, 174 N.Y.S.2d at 641–43, 151 N.E.2d at 79–80 (wrongfully expelled union members sued national union and local for expulsion; union held liable under contract theory and under theory that union, in spite of lack of ratification, delegated to its members the responsibility for performing certain acts). Because of the inconsistency between *Martin* and *Madden*, and the similarity of the instant action to *Madden*, it is unclear whether this would be a situation in which New York courts would apply the rule of *Martin*, or carve out an exception as was done in *Madden*.

■ Even if the *Martin* rule applies, we conclude that it is inconsistent with the goals of section 1983 and thus must be disregarded. Proof of authorization by every member of each Committee, given the size of the Committees and the unlikelihood that a formal vote would be taken to authorize patently illicit activity, would be a virtually impossible burden to meet and would certainly extinguish Jund's claim. A state rule, however, cannot be deemed inconsistent with federal law and disregarded simply because it extinguishes the particular plaintiff's cause of action. *Tomanio*, 446 U.S. at 488, 100 S.Ct. at 1797. It can be disregarded only if it is inconsistent with

the policies underlying section 1983—deterrence and compensation. *Id.; see Robertson*, 436 U.S. at 590, 98 S.Ct. at 1995. The policies of section 1983 would be undermined if an unincorporated association could avoid substantive liability unless and until unanimous membership authorization or ratification were proved. Requiring such proof, no matter how large the association involved, before assessing liability would prove an insurmountable obstacle to virtually any plaintiff. Where, as here, the plaintiff has proven the existence of violative practices and has proven that he was harmed, he almost uniformly would be denied compensation for his injury. In addition, there would be no deterrent effect on the unincorporated associations. Indeed, imposing on plaintiffs the burden of proving unanimous authorization would give unincorporated associations a license to continue violative and abusive practices with impunity, safe in the knowledge that the organization's assets would be untouchable as long as the membership did not expressly approve the continuation of the illicit activity. Thus, if *Martin* controls, both goals of section 1983 would be undermined, not just for Jund, but for any plaintiff seeking redress from a large unincorporated association. For this reason we conclude that New York law is inconsistent with federal law and must be disregarded in this action. The district court, therefore, properly permitted the jury to predicate liability on an apparent authority theory.

### 2. *RICO Liability*

#### a. *The Committees as "Persons"*

■ The Republican Committees claim that they are immune from suit under RICO because they are not "persons" as defined by RICO. This argument also lacks merit.

Title 18 of the United States Code, section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such en-

terprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In the same title, a "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). The Committees argue that New York law makes unincorporated associations incapable of holding a legal or beneficial interest in property and thus insulates unincorporated associations from RICO liability.

■ In contrast to partnerships and corporations, unincorporated associations are not artificial entities and thus have no existence independent of their membership absent statutory recognition or authorization. *See Ostrom v. Greene,* 161 N.Y. 353, 361–62, 55 N.E. 919, 921–22 (1900); *see also Mount v. Tuttle,* 183 N.Y. 358, 366–67, 76 N.E. 873, 875 (1906) (voluntary unincorporated association incompetent to take or hold property); *Bradley v. O'Hare,* 11 A.D.2d 15, 28, 202 N.Y.S.2d 141, 153 (1st Dep't 1960) (same). With respect to the Committees, however, statutory recognition and authorization can be found in the New York Election Law. *See* N.Y.Elec. Law § 2–100 *et seq.* (McKinney 1991). New York law specifically allows for the maintenance of assets by the Committees, *see, e.g.,* N.Y.Elec.Law § 2–126, and implicitly provides for the maintenance of bank accounts, solicitation of funds, procurement of credit, etc. The Committees, under these provisions, are required to file with the state a copy of the Committees' rules and amendments to such rules, *see* N.Y.Elec.Law § 2–114, an obligation analogous to the requirement that a corporation file a copy of its charter and Articles of Incorporation. Furthermore, New York General Associations Law also recognizes that unincorporated associations can hold an interest in property. *See Mills Music, Inc. v. Cromwell Music, Inc.,* 126 F.Supp. 54, 65 (S.D.N.Y.1954). Specifically, New York law provides for the maintenance of actions by and against unincorporated associations, N.Y.Gen.Ass'ns Law §§ 12, 13 (McKinney 1991), and dictates that judgments against unincorporated associations will be satisfied "out of any personal or real property belonging to the association, or owned, jointly or in common, by all the members thereof." N.Y.Gen.Ass'ns Law § 15. *See Lloyd v. Sloan,* 259 A.D. 615, 616, 19 N.Y.S.2d 842, 844 (1st Dep't 1940); *Mandell v. Moses,* 209 A.D. 531, 534–35, 205 N.Y.S. 254, 256–57 (3d Dep't), *aff'd,* 239 N.Y. 555, 147 N.E. 192 (1924). Thus, we conclude the Committees are capable of holding property and therefore come within the definition of "person" for the purposes of RICO.

### b. *Applying RICO to the Committees is Not Violative of the First Amendment*

■ The Committees point out that the solicitation of funds from public employees is a form of speech protected under the First Amendment. *See Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 797–99, 105 S.Ct. 3439, 3446–47, 87 L.Ed.2d 567 (1985). We need not address this argument. There is no attempt here to limit access to any particular forum, as was the case in *Cornelius.* Nor is there any attempt to curb the content of speech. Instead, Jund only seeks redress for practices of the Committees that are not protected by the First Amendment. It is elementary that criminal acts, including Hobbs Act violations, may be punished. Punishment is all that is involved here, the form of punishment requested is money damages, an entirely repercussive means that does not impermissibly abridge the Committees' freedom of speech. *Cf. Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 639, 100 S.Ct. 826, 837, 63 L.Ed.2d 73 (1980) (" 'Frauds may be denounced as offenses and punished by law.... If [this] ... is less efficient and convenient than ... [predetermining] what information may be disseminated ... and who may impart [it], the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.' ") (citation omitted). Our decision herein does not prohibit solicitation or speech; it merely recognizes a preexisting prohibition on extortion.

The Committees fear being stigmatized by any award in favor of Jund and claim that such a stigma will deter the membership from soliciting in the future. The Supreme Court in *Sedima,* 473 U.S. 479, 105 S.Ct. 3275, noted that the stigma resulting from a civil RICO judgment "leaves no greater stain than do a number of other civil proceedings." *Id.* at 492, 105 S.Ct. at 3283. Courts in the past have rejected this fear of stigma and the potentially chilling effect a judgment could have on future solicitation. *See United States v. Dozier,* 672 F.2d 531, 540 n. 5 (5th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); *United States v. Cerilli,* 603 F.2d 415, 422 (3d Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980). So, too, do we reject the claimed fear in the instant case. The defendant Committees are not being punished for their advocacy or their political positions; they are being punished for a longstanding coercive solicitation scheme that the jury found ceased at least six years ago. Punishment for the execution of this scheme should have no effect on the legitimate First Amendment activities of the Committees.

The district court's ruling that the Committees were liable under RICO also does not interfere with the rights of the Committees' members to free political association. We decline to accept the Committees' argument that members or prospective members will be deterred from maintaining any association with the Committees because of the "specter of racketeering liability." This argument resembles the fear of stigma argument. The Committees themselves point out that the violations took place some time ago. There are no allegations that the coercive solicitation scheme continues today, nor are there any allegations in this action that the plan continued past 1978. The "specter" does not arise out of legitimate activities related to their political purpose, but instead arises from the extortionate acts committed by the Committees more than a decade ago. Association with the legitimate activities of the Committees, therefore, should not create a reasonable "specter of liability."

Finally, the Committees contend that punishing them will penalize the current membership, not the individuals who were involved in the scheme. Liability, however, is assessed against the Committees' assets, not the assets of the members. Failure to assess liability simply because the membership of the Committees has changed over time would be unjust to the plaintiff and would allow Committees to perpetrate violative acts and then avoid liability by delaying litigation until the membership changed. This cannot be permitted.

### c. *Predicate Acts*

■ The Committees assert that they are incapable, as unincorporated associations, of committing the predicate Hobbs Act criminal violations that provided the basis for a finding of liability under RICO.

■ We have little guidance when we analyze whether an unincorporated association may be found criminally liable. Generally, courts have stated that "in the absence of a clear legislative intent to impose criminal responsibility, an unincorporated association of persons as an entity cannot be indicted and convicted of a crime, since, if a crime is committed, it must be committed by them as individuals." 7 C.J.S. *Associations* § 38, at 88–89 (1980). *See United States v. A & P Trucking Co.,* 358 U.S. 121, 127–28, 79 S.Ct. 203, 208, 3 L.Ed.2d 165 (1958) (Douglas, *J.,* dissenting); *United States v. Local 807,* 118 F.2d 684, 688 (2d Cir.1941) (Clark, *J.,* concurring), *aff'd,* 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942); *State of South Dakota v. Kandaras For Senate Comm.,* 264 N.W.2d 902, 903–04 (S.D.1978).

We, therefore, must determine whether there has been a clear expression of legislative intent to impose criminal liability on unincorporated associations. The Hobbs Act states, in pertinent part:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any per-

**1284**

son or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The term "whoever" is not defined in the Hobbs Act itself. Section 1 of title 1 of the United States Code, the general statutory construction law that was enacted on the same day the criminal code was adopted, *see A & P Trucking,* 358 U.S. at 123 n. 2, 79 S.Ct. at 206 n. 2, provides: "In determining the meaning of any Act of Congress, unless the context indicates otherwise— ... the words 'person' and 'whoever' included corporations, companies, associations, firms, partnerships, societies and joint stock companies, as well as individuals." 1 U.S.C. § 1. Thus, unincorporated associations fall within the definition of "whoever" and may be liable for Hobbs Act violations.

The Supreme Court has used 1 U.S.C. § 1 at least twice to impose criminal liability on organizations like unincorporated associations. In *A & P Trucking,* while addressing the liability of a partnership, the Court acknowledged and applied the common law notion that a partnership was not a separate entity for purposes of suit. The Court held, however, that Congress changed the common law in enacting 18 U.S.C. § 835, since "nothing in that section which would justify our not applying to the word 'whoever' the definition given it in 1 U.S.C. § 1, which includes partnerships." *Id.* at 124, 79 S.Ct. at 206. The Supreme Court stated that "the power of Congress to change the common-law rule is not to be doubted." *Id.* at 124, 79 S.Ct. at 206 (citing *United States v. Adams Express Co.,* 229 U.S. 381, 33 S.Ct. 878, 57 L.Ed. 1237 (1913) (joint stock association indictable for misdemeanor)). The Court concluded: "[T]he business entity cannot be left free to break the law merely because its owners, stockholders ... partners ... do not personally participate in the infraction." *Id.* 358 U.S. at 126, 79 S.Ct. at 207. The *A & P Trucking* Court expressly rejected the view that the term "knowingly" as used in section 835 precluded imposing liability on a partnership because corporations and associa-

tions, no matter how organized, "can be guilty of 'knowing' or 'willful' violations of regulatory statutes through the doctrine of *respondeat superior.*" *Id.* at 125, 79 S.Ct. at 206.

Although *A & P Trucking* concerned criminal liability of a partnership for misdemeanors, the reasoning of that decision is directly applicable here. The language of the Hobbs Act does not differentiate between persons and associations and provides no indication that the term "whoever" should have any other meaning than that prescribed in section 1 of title 1 of the United States Code. Under 1 U.S.C. § 1, the term "whoever" expressly includes associations. Just as the administrative regulations at issue in *A & P Trucking* were furthered by imposing liability on all violators, so too is the purpose of the Hobbs Act furthered by imposing liability on all those who interfere in interstate commerce, no matter how they are organized. *See United States v. Culbert,* 435 U.S. 371, 376–77, 98 S.Ct. 1112, 1115, 55 L.Ed.2d 349 (1978). In the instant case, the 1985 jury's finding that the violative acts and practices of the Committee members were authorized by the membership clears the way for the imposition of criminal liability on the association. Further supporting this conclusion is the fact that the fruits of the Hobbs Act violations, the coercively obtained contributions, went into the coffers of the Committees themselves, not to the individual members who actually solicited the employees. We thus see no bar to the imposition of criminal liability on the Committees. Moreover, any judgment entered will be assessed against association assets.

### d. *Nexus with Interstate Commerce*

The Committees assert that Hobbs Act violations cannot serve as the predicate acts for Jund's RICO claim because Jund failed to establish a nexus between the violations and interstate commerce. In the instant action the question of a nexus with interstate commerce was put to the 1985 jury in special verdict question 9(c)(ii), which asked: "Were the defendants Nassau County Republican Committee, Town

of Hempstead Republican Committee and Town of Hempstead an enterprise which engaged in or whose activities affected interstate commerce?" This question evoked a positive response from the jury. This jury finding of a nexus with interstate commerce will be given the same degree of deference due all jury findings; thus, it will not be overturned unless no reasonable jury could have reached that conclusion. For the reasons discussed below, we reject the Committees' contention and conclude that the jury's finding was supported by the evidence.

■ The Hobbs Act has been interpreted to prohibit the illegal interference or attempted interference with interstate commerce in any way or degree, even if the effect is only minimal. *See United States v. Gambino*, 566 F.2d 414, 418 (2d Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). If the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under the Hobbs Act. *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982); *United States v. Augello*, 451 F.2d 1167, 1169–70 (2d Cir.1971), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972).

■ In this action we conclude that the jury's finding of a nexus with interstate commerce in the 1985 verdict was supported by the evidence and by reasonable inference. The overall coercive solicitation scheme affected a large number of employees of the Town of Hempstead. Each person who contributed to the Committees or was denied a promotion as a result of that scheme was left with less money to spend on items involved in interstate commerce, which would include most foodstuffs, household goods and clothing. Thus, this action is distinguishable from *United States v. Merolla*, 523 F.2d 51 (2d Cir. 1975), on which the Committees rely. *Merolla* involved a one time only effect on interstate commerce. *Id.* at 55. In contrast, the instant action involved a consist-

ent and long-lasting effect on commerce by reducing the funds available to all those victimized by the scheme. While the Committees may consider this effect too attenuated, it is consistent with the findings of other courts. *See United States v. Anderson*, 809 F.2d 1281, 1286 (7th Cir. 1987) (driving tickets fixed as a result of extortion or bribes affected interstate commerce); *United States v. Wright*, 797 F.2d 245, 248–49 (5th Cir.1986) (failure to prosecute drunk drivers increased the number of accidents on interstate highways thereby having an impact on interstate commerce), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987); *United States v. Murphy*, 768 F.2d 1518, 1530–31 (7th Cir. 1985) (payment of bribes by lawyers left them with less money to spend on envelopes, stationery and law books from out of state), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986); *United States v. Boulahanis*, 677 F.2d 586, 589–90 (7th Cir.) (extortion resulted in social club having less money to spend on coffee purchased from out of state), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). *See also United States v. Blakey*, 607 F.2d 779, 784 (7th Cir.1979) (removal of $1,000 from victim's pocket could curtail his purchases in interstate commerce). In the case at bar, while the impact from any single person was undoubtedly slight, the cumulative effect on interstate commerce from all those victimized by the scheme could have been very substantial. In any event the degree of the effect on interstate commerce is immaterial because the Hobbs Act prohibits *any* interference with commerce through extortion. The jury reasonably found that interference to have occurred.

3. *The Grant of Partial Summary Judgment*

In dismissing Jund's complaint in 1990, after granting j.n.o.v., the district court did not mention the partial summary judgment granted in 1989 and provided no reason for its dismissal. As the preceding discussion indicates, there was sufficient evidence to sustain the finding of liability under both section 1983 and RICO. The 1985 factfind-

ing and the district court's additional fact-finding made pursuant to our opinion in *Cullen*, 811 F.2d 698, warranted the district court's grant of the partial summary judgment in favor of Jund. That award, for $2,257 in damages under section 1983, trebled under RICO, for a total of $6,771 in damages assessed against the Committees, plus costs and interest, should be reinstated.

### a. *Damage Cut-Off*

■ Jund asserts that the cut-off date for his damages, May 4, 1976, the date he was injured while working as a Sanitation Man I (helper), was incorrect and that his damages should continue after that date. We do not agree. Jund was injured on the job, while lifting trash, three years after he was denied the promotion. Applying tort law principles, *see Carey v. Piphus*, 435 U.S. 247, 257–59, 98 S.Ct. 1042, 1049–50, 55 L.Ed.2d 252 (1978), we look to the issue of proximate causation. " 'Proximate cause' ... is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct." *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 41, at 264 (5th ed. 1984) [hereinafter *Prosser on Torts*].

> An injury or damage is proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

E. Devitt, C. Blackmar & M. Wolff, *Federal Jury Practice and Instructions: Civil* § 80.18, at 170 (4th ed. 1987). If we conclude that the Committees' conduct was a substantial cause of Jund's injury—that the injury probably would not have occurred if Jund had been promoted—then the Committees would be responsible for damages arising out of the injury as well as the failure to promote. However, "[i]f [an] intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, it may well be a superseding act [that] breaks the causal nexus." *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (1980) (citations omitted). We conclude that Jund's injury was both independent of the Committees' conduct and too far removed from it, breaking the causal nexus between the two. Jund failed to establish, as a prima facie matter, that it is more likely than not that the failure to promote him was a cause of his injury. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Prosser on Torts* § 41, at 269 (footnotes omitted). The district court, therefore, properly limited Jund's damages as a matter of law to lost wages from April 1, 1973, the date of the demotion, to May 5, 1976, the date of Jund's injury.

### B. *The 1990 Trial*

The Committees and the Town raise several complaints arising out of the 1990 trial.

### 1. *Evidence Arising After the Amended Complaint*

The Town maintains that evidence of events alleged to have occurred after the service of the amended complaint should not have been admitted into evidence. The amended complaint was served in April 1978. Thus, in the Town's view, Jund's claims relating to the discrimination he alleges to have experienced in July 1978 must be dismissed. In a similar objection, the Committees assert that a 1985 order issued by Judge Mishler during the trial prohibited members of the class from asserting claims arising out of events that occurred subsequent to the class certification in 1977 because "undue prejudice" to the defendants precluded any such claims.

The undue prejudice to which the court referred in the 1985 order was prejudice arising out of the expansion of the class to

include the supplemental claims on the eve of or during trial. The prejudice was not defined as prejudice arising out of claims of which the Committees were already aware.

■ We are not persuaded by the Town's assertion that because Jund did not amend the complaint pursuant to Rule 15(d) of the Federal Rules of Civil Procedure Jund is precluded from presenting evidence related to claims not contained in the pleadings. The Town's reading of the Federal Rules is far too restrictive. Rule 15(b) of the Federal Rules of Civil Procedure states, in pertinent part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

As the rule indicates, and as will be made clear below, had a strong objection to Jund's failure to amend the complaint been raised, Jund could have amended his complaint because the claims arise out of the scheme that was the focus of the pleadings, the claims are directly related to the earlier violation, and there was no undue prejudice to the defendants.

It must be recognized that the 1985 trial did not arise out of Jund's claims alone; it was a class action. The trial's purpose was to ascertain the substantive liability of the Committees and the existence of the coercive practice and policy of the defendants, not the particular damages of individual plaintiffs. *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984). "While a finding of a pattern or practice of discrimination itself justifies an award of prospective relief to the class, additional proceedings are ordinarily required to determine the scope of individual relief for the members of the class." *Id.* (citing *Teamsters v. United States,* 431 U.S. 324, 361, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977)). The determination of the scope of relief to which Jund is entitled was the purpose of the 1989 and 1990 trials.

The jury, in the 1985 factfinding trial, determined that the Republican Committees, with the participation of the Town, had managed a scheme of coercive contributions from 1973 through at least January 1, 1976. The jury found, in 1985, that the scheme had not continued into the relatively recent past; the jury did not determine when the scheme ended, leaving it unclear when damages arising from the scheme would cease.

In 1985 Jund filed a claim form, which provided the basis for the 1989 and 1990 trials. On that claim form Jund informed the Committees and the Town of his claim of injuries arising out of incidents in 1973, 1976 and 1978. This effectively put the Town and Committees on notice of Jund's claims and of his intent to present evidence relating to those claims. Pretrial depositions were taken and extensive discovery and summary judgment motions were made before the 1989 trial and the 1990 trial, ensuring that the defendants were aware of virtually all evidence Jund intended to present with respect to the 1978 claims. The Town and the Committees have made no attempt to show how they were prejudiced such that the evidence relating to the 1978 promotion denials should not have been admitted. As Rule 15(b) makes clear, amendment is not necessary and, in the absence of prejudice, the failure to amend will not affect the judgment rendered. The Town and Committees had approximately four years' notice of the facts

and circumstances surrounding the 1978 violation and were aware of Jund's intent to present evidence on the issue at trial, a claim of prejudice at this late date would be implausible. Furthermore, contrary to the defendants' assertions, the 1978 violation is not a new claim; it is merely an added injury flowing from the same claim that commenced this litigation.

### 2. *The Continuation of the Coercive Scheme*

█ The Town and the Committees assert on appeal, as they contended at trial, that the district court erroneously permitted the jury to infer that because there was a custom and policy of coercive solicitation of contributions in 1973–1976, there was such a policy in 1978. The defendants also claim that, even with the inference, the evidence in the 1990 trial did not support a finding that there was an official custom or policy, plan or procedure in 1978 which would support Jund's claim of discrimination. The Committees go on to contend that if there were no evidence of an official custom or policy in 1978 the Town cannot be held liable. It follows that if the Town's involvement cannot be ascertained, the Committees cannot be held liable because the requisite state action would be lacking. We believe the court correctly permitted an inference that the coercive contribution scheme continued and the evidence supported the jury's finding that the failure to promote Jund to the position of Sanitation Inspector II was a result of that scheme.

There is a "general presumption of the continuance of a status or condition once proved to exist." *McFarland v. Gregory*, 425 F.2d 443, 447 (2d Cir.1970); *McCormick on Evidence* § 344, at 976–77 (3d ed. 1984). In *McFarland* we held that a presumption of continuity is a reasonable grounds "on which to draw inferences where (1) a situation or the circumstances surrounding it do not go through an apparent material change and (2) the lapse of time is not great enough to suggest that unknown circumstances or causes, in the normal course of events, will have changed the situation." *McFarland*, 425 F.2d at 447.

Based on the facts of the instant case, the district court would have been acting within its authority if it had instructed the jury on this continuity presumption because the existence of the coercive contribution scheme through January 1, 1976 was conclusively determined by the 1985 jury. Instead, however, the district court instructed the jury only that there was an inference of continuity, a guideline far less favorable to Jund and far more advantageous to the Committees and the Town.

On appeal we view "the evidence and all reasonable inferences therefrom in the light most favorable to the jury's determination." *Pregeant v. Pan American World Airways, Inc.*, 762 F.2d 1245, 1249 n. 5 (5th Cir.1985) (citing *Haley v. Pan American World Airways*, 746 F.2d 311, 317 (5th Cir.1984)). The inference of continuity provided to the jury was reasonable and was supported by common experience and logic; it was not merely the result of speculation and conjecture. *See Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 744 (2d Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). The inference was entirely correct.

█ The Committees and the Town claim it was improper for the burden of proof to be shifted to them to prove that the coercive scheme or practice did not continue to 1978. Had the district court instructed the jury on a presumption of continuity, which we have already determined would have been correct, burdens would have shifted. The jury would have been instructed that the presumption of continuity imposes on the Town and Committees the burden of going forward with evidence to rebut the presumption. *See* Fed.R.Evid. 301; *see generally McCormick on Evidence* § 344, at 982–83. The district court thus properly placed the burden of proof on defendants in this regard. The defendants, however, also contend that the district court improperly placed the burden of proof on them to disprove that but for the scheme Jund would have been promoted. We disagree.

The initial burden in an employment discrimination case is on the plaintiff to show that his conduct was constitutionally protected and that this conduct was a substantial factor in the employer's decision not to hire or promote him. *See Mount Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Courts should then go on to consider whether the defendant showed, by a preponderance of the evidence, that it would have reached the same decision regardless of the plaintiff's constitutionally protected conduct. *Id.* This implicit shift is just, because, in an employment discrimination context, the employer is in a better position to show why a specific action was or was not taken. The employer, thus, is given the opportunity to prove that there were legitimate, nondiscriminatory reasons for its action and that the result would have been the same even in the absence of the allegedly improper basis for its conduct. *See id.*

By showing that he would have been promoted had it not been for the scheme, and by calling upon the inference that the scheme continued, Jund has established a prima facie case of employment discrimination. After Jund established a prima facie case, the Committees and Town were afforded an opportunity to undermine Jund's evidence by providing proof of the legitimacy of their actions. *See id.* The special verdict, as submitted to the jury, reflected the shifting burdens of going forward: the verdict form stated that *"Defendants have the burden of establishing the negative (NO) in answer to both questions."*

Two questions were put to the jury in the 1990 trial: (1) did the coercive solicitation scheme continue into 1978?, and (2) but for that scheme would Jund have been promoted to the position of Sanitation Inspector II? The jury in the 1990 trial answered both questions in the affirmative. The Town claims the evidence was insufficient to support this conclusion.

The Town asserts that the mere inference of continuation does not establish that the custom or policy existed in 1978. *See Monell v. Dep't of Social Servs.*, 436 U.S.

658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The inference of continuation alone, however, was not the only evidence supporting the jury's conclusion. The jury had before it the 1985 findings, including that Commissioner Landman had coercively solicited Jund in 1976. Also before the jury was the testimony of Donald Woolnough, which indicated that the same individuals were still responsible for managing the Committees' and Town's activities. The jury had evidence that hiring and promotion decisions were still made in the same fashion, based on Committee recommendations by the same Committee representatives. The jury also learned that no notice was sent to local party leaders in 1976 asserting that hiring and promotion policies with respect to contributions had changed. Additionally, the jury knew that, as was true before 1976, from 1976 to 1979 the majority of Committee recommendations for jobs was heeded. This evidence, as well as that in the record, was sufficient to support a jury finding that the practice continued until 1978. This proof was also sufficient to establish Jund's case thereby requiring the Committees and the Town to undermine Jund's proof, or in some way establish by a preponderance that the decisions were made for legitimate reasons.

The Town relies on *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), to support its position that the ultimate burden of persuasion is always on the plaintiff. *See id.* at 659, 109 S.Ct. at 2125–26. This of course, is true, but it does not prove the Town's point. If a plaintiff provides direct evidence of discrimination, that is, evidence that shows "an illegitimate factor played a motivating or substantial role in the employment decision," *Grant v. Hazlett Strip–Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir.1989), then the burden shifts to the employer "to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken the illegitimate factor into account." *Id.* The employer's burden in this regard, however, "is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the

employer, if it wishes to prevail, must persuade it on another." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989). We are persuaded that Jund's evidence, as described above, is sufficient to shift this affirmative defense onto the employer. The district court therefore properly placed the burden of proof onto defendants to disprove that but for the scheme Jund would have been promoted in 1978. The Town did attempt to undercut Jund's case. Ultimately, all the proof was submitted to the jury and the jury concluded that the practice and procedure had continued and that Jund would have been promoted but for the practice and procedure. The Town and the Committees have failed to convince us that the verdict was not supported by the evidence.

The district court apparently reached a conclusion contrary to the one we reach today when it granted judgment n.o.v. in favor of the defendants.

### 3. *The Judgment N.O.V.*

The standard for granting a motion for judgment n.o.v. pursuant to Rule 50(b) is whether " 'the evidence, viewed in the light most favorable to the non-movants without considering credibility or weight, reasonably permits only a conclusion in the movants' favor.' " *Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir.1983) (quoting *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982)); *Svoboda v. Bowers Distillery, Inc.*, 745 F.2d 528, 530 (8th Cir.1984). The standard is the same as for a directed verdict. *See* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2537, at 599 (1971). A judgment n.o.v. is proper if

> "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him."

*Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir.1984) (quoting *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980)). Our standard for reviewing a grant of a j.n.o.v. is the same as that which the district court should apply in deciding the motion. *See C–Suzanne Beauty Salon, Ltd. v. General Ins. Co. of Am.*, 574 F.2d 106, 112 n. 10 (2d Cir.1978); 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2536 (1971).

We have already determined that the jury's verdict was supported by the evidence. For this reason we conclude that the district court should not have granted j.n.o.v. The jury verdict and the complaint should be reinstated.

### 4. *Jund's Resignation*

 Jund claims that the district court improperly determined the cut-off date for damages from the 1978 violation when it incorrectly found that his resignation in 1980 was voluntary. The issue of the voluntariness of his resignation, asserts Jund, presented a question of fact for the jury. We agree with the district court that Jund's resignation was, as a matter of law, voluntary.

Jund's own testimony and the circumstances of his resignation reveal that Jund knew exactly what benefits he was forgoing by resigning. The district court found that Sanitation Commissioner Landman warned Jund of what would be lost if Jund chose to resign. Thus, Jund's decision to resign was voluntarily and knowingly made. At the time Jund resigned this action was pending and Jund was represented by counsel. Under these circumstances the district court correctly determined as a matter of law that Jund understood the implications of his decision. The date of his resignation was the appropriate date for measuring damages. Because we conclude that Jund's resignation was voluntary, we need not address his claim regarding pension benefits and vesting.

### 5. *The "But For" Test*

 Jund claims that the district court, in presenting to the jury the issues in-

volved in the 1989 and 1990 trials, erroneously required Jund to meet the "but for" standard. That is, the district court required Jund to prove that he would have been promoted "but for" the discriminatory policy maintained by the Town and the Committees. Instead, Jund asserts that the district court should have used the standard applied in *Ibrahim v. New York State Dep't of Health,* 904 F.2d 161 (2d Cir.1990).

In *Ibrahim,* after the plaintiff established a prima facie case of discrimination under Title VII, the defendant proved that it had legitimate nondiscriminatory reasons for its actions. The district court then went on to determine that the reasons were mere pretext. The court discussed the shifting burdens of proof established in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and stated that "[t]he theory that underlies this system of proof relies, at least in part, on the observation that 'those who can demonstrate no legitimate reason for acting more likely than not acted for a discriminatory reason.'" *Ibrahim,* 904 F.2d at 168 (quoting *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1113 (2d Cir.1988) (discriminatory discharge action brought under ERISA)). This authority does not aid Jund, however. In this action the Town set forth reasons for the failure to promote him.

The Supreme Court, in *Mount Healthy,* 429 U.S. at 286–87, 97 S.Ct. at 1575–76, expressly approved use of the "but for" test. *Mount Healthy* involved an untenured teacher who conveyed to a radio station an internal memo relating to teacher dress and appearance circulated by the school principal to certain teachers; the radio station announced the memo as a news item. The teacher, who had exhibited objectionable conduct in the past, was thereafter informed that he would not be rehired. The district court determined that the decision not to rehire the teacher was discriminatory because the school board had considered in making its decision the teacher's protected conduct of speaking with the radio station; this was affirmed by the Sixth Circuit. *Id.* at 276, 97 S.Ct. at

570. The Supreme Court reversed and concluded that "the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.* at 287, 97 S.Ct. at 576. In other words, the district court should have determined whether the respondent would have been reemployed "but for" the employer's consideration of the protected conduct. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 249–50, 109 S.Ct. 1775, 1790, 104 L.Ed.2d 268 (1989).

The district court in the instant action correctly adopted this criterion in the 1989 and 1990 trials, as is exhibited, in part, by the special verdict that was submitted to the jury in the 1990 trial. It stated, in pertinent part:

*Defendants have the burden of establishing the negative (NO) in answer to both questions.*

. . . .

2. Would Jund have been appointed in 1978 from the list of eligible candidates to a position of Inspector II but for his refusal to contribute to the Republican Party in response to Commissioner Landman's request in December 1976?

Thus, as we previously concluded, the district court properly imposed the "but for" standard on the defendants, and so there is no merit to Jund's claim that he bore the burden of proof on this issue.

### CONCLUSION

We have considered the other claims of the parties and find them to be without merit.

For the foregoing reasons, the judgment of the district court granting judgment n.o.v. and dismissing Jund's complaint is vacated. The 1989 grant of partial summary judgment and the verdicts of both the 1989 and 1990 trials are reinstated. This action is remanded for further proceedings consistent with this opinion.